**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

JAMES LAMBERT,               :       CIVIL ACTION
           Petitioner          :
                              :
           v.                    :
                              :
JEFFREY BEARD, et al,       :       NO 02-9034
           Respondents      :

**MEMORANDUM**

**Baylson, J.**                                                    **July 24, 2007**

I.      Introduction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

II.     Factual Background . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

III.   Procedural History . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

IV.   Overview of the Claims . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4
      A.     Federal Habeas Petition . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4
           1.     Guilt Phase . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4
           2.     Penalty Phase . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6
      B.     Direct Appeal . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7
      C.     First PCRA Proceedings . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8
      D.     Second PCRA Proceedings - Claim 2 . . . . . . . . . . . . . . . . . . . . . . . . 17

V.      Exhaustion and Procedural Default . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

VI.    Relaxed Waiver . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

VII.   Standard of Review under AEDPA . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

VIII.  Standard for Ineffective Assistance of Counsel ("IAC") Claims . . . . . . . . . . . . . . . . . . 22

IX.    Analysis of Guilt-Phase Claims . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23
      A.     Claims 1 and 2 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23
      B.     Claims 3, 4, 5 and 10 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25
           1.     Claim 10 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25
           2.     Claim 3 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27
           3.     Claim 4 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

    4.    Claim 5 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

C.    Claim 6 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

D.    Claim 7 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

E.    Claim 8 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

F.    Claim 9 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

G.    Claim 10 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

H.    Claim 11 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

    1.    *Lambert-1* Court's Rejection of the *Batson* Claim . . . . . . . . . . . . . . . 47

        a.    State Court's Failure to Conduct a Hearing . . . . . . . . . . . . . . 47

        b.    State Court's Finding of No Prima Facie Case under *Batson*

            . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 50

    2.    PCRA Court's Rejection of the *Swain* Claim . . . . . . . . . . . . . . . . . . . 54

    3.    Request for a Federal Evidentiary Hearing under § 2254(e) . . . . . . . . . 55

    4.    Ineffective Assistance of Counsel Claim . . . . . . . . . . . . . . . . . . . . . . . . 57

I.    Claim 12 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 60

J.    Claim 14 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 62

    1.    Court-Appointment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 62

    2.    Pre-trial Incarceration . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 64

X.    Analysis of Penalty-Phase Claims . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 66

A.    Claim 13 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 66

    1.    Guilt Phase . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 67

    2.    Penalty Phase . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 68

B.    Claim 15 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 69

    1.    *Caldwell v. Mississippi* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 70

    2.    Application of *Caldwell* in the Third Circuit . . . . . . . . . . . . . . . . . . . . 71

    3.    Analysis of Petitioner's Claim . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 73

C.    Claim 16 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 75

    1.    *Mills* and its Application in the Third Circuit . . . . . . . . . . . . . . . . . . . 77

    2.    Lambert's Jury Instructions and Verdict Form . . . . . . . . . . . . . . . . . . 83

D.    Claim 17 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 87

E.    Claim 18 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 89

F.    Claim 19 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 93

    1.    Summary of Lambert's Sentencing Hearing . . . . . . . . . . . . . . . . . . . . . 94

    2.    Competency Claim . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 97

        a.    Trial Court's Failure to Order a Competency Hearing Sua Sponte

            . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 97

        b.    Defense Counsel's Ineffectiveness in Failing to Seek a Competency

            Hearing . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 100

        c.    Whether Petitioner's Waivers were Knowing, Intelligent and

            Voluntary . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 101

            I.    Right to Present Mitigating Evidence . . . . . . . . . . . . . 101

            ii.    Right to Counsel . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 102

G.    Claim 20 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 103

    1.    Ineffective Assistance of Counsel Under *Strickland* . . . . . . . . . . . . . . 104

        2.   Constructive Abandonment Under *Cronic* . . . . . . . . . . . . . . . . . . . . . . . . 105

H.  Claim 21 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 105

I.  Claim 22 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 106

J.  Claims 23 and 24 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 108

XI.  Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 109

## I.    __Introduction__

Petitioner, James Lambert ("Petitioner" or "Lambert"), a death sentenced state prisoner, filed a Petition for Writ of Habeas Corpus in this Court pursuant to 28 U.S.C. § 2254 on December 12, 2002.  By agreement of counsel, the case was placed in the civil suspense file on March 6, 2003, pending exhaustion of Petitioner's second post-conviction petition in state court, raising a Brady claim ("Claim 2").  This Court restored Petitioner's case to its active docket on November 4, 2005, and, after extensive briefing, held oral argument on October 4, 2006.  The parties have filed several post-argument letter briefs with the Court on a number of issues, including Batson v. Kentucky, 476 U.S. 79 (1986) and the recent Supreme Court decision, Schriro v. Landrigan, 127 S.Ct. 1933 (2007).

## II.    __Factual Background__

_____ The facts underlying Petitioner's conviction are as follows.  On September 23, 1982, Petitioner, Bruce Reese, and Bernard Jackson agreed to rob a bar in Philadelphia.  Reese and Jackson were brothers-in-law and had committed several bar robberies together in the past, while Lambert was a newcomer to the group.  Jackson first drove the men to the Hatfield Lounge at 57th and Hatfield Streets, but decided the bar was too crowded and proceeded to Prince's Lounge at 46th and Walnut Streets.  Jackson entered Prince's Lounge alone to see if a female friend was working, and upon seeing that she was not, he returned to the car.  Lambert and Reese then entered the bar, each armed with a handgun provided by Reese, while Jackson remained in the car to serve as the "getaway" driver.

The trial testimony established that upon entering Prince's Lounge, one man ("Man #1") remained in the entryway at the top of the stairs, while the other ("Man #2") walked to the rear

1

bar and pointed a gun in the face of a barmaid, Janet Ryan.  Ryan immediately dropped to the

floor and ran to the ladies room.  Man #1 instructed a second barmaid, Sarah Clark, to "get the

money."  While Clark was placing money in a bag, she heard two gunshots from the rear of the

bar and saw one patron fall onto Man #2.  Two patrons, James Graves and James Huntley, had

been shot to death by a single actor.  Reese and Lambert then fled the scene and sped away in the

car driven by Jackson.

Two weeks later, Jackson was arrested for an unrelated robbery.  While in custody, he

told the police about the Prince's Lounge robbery and identified Lambert and Reese as the

perpetrators.  Lambert and Reese were then arrested and charged with murder, robbery, criminal

conspiracy, and possession of an instrument of crime.  Darryl Irwin, defense counsel for Lambert,

filed a written  motion to sever Lambert's trial from Reese's.  Judge Geisz denied the motion

after extensive oral argument.[1]  See N.T. Mar. 23, 1984 at 7-37, 54-85.  Lambert and Reese were

then jointly tried before Judge Geisz and a jury in the Philadelphia Court of Common Pleas.  At

trial, Jackson testified for the Commonwealth in exchange for an open guilty plea to third degree

murder, robbery, conspiracy, and several unrelated crimes.  Janet Ryan also testified, once for the

Commonwealth and once for co-defendant Reese.  During her testimony for the Commonwealth,

she was unable to identify the gunman.  However, shortly after stepping down from the stand,

Ryan approached the prosecutor and indicated that she recognized Lambert as the man who had

thrust the gun in her face.  Although Judge Geisz would not permit the Commonwealth to recall

Ryan, he allowed Reese to call her as a defense witness.  While testifying for the second time,

---

[1] Irwin renewed his motion for severance shortly before trial started, and again after
Jackson testified on direct examination.  (N.T. Apr. 9, 1984 at 100-04; Apr. 12, 1984 at 69).  The
court denied both motions.  (N.T. Apr. 9, 1984 at 104; Apr. 12, 1984 at 79).

Ryan identified Lambert as the man who had approached her.  No other witness in the bar was able to identify Lambert or Reese as the perpetrators.

On April 25, 1984, the jury found Lambert guilty of two counts of first degree murder, robbery, criminal conspiracy, and possession of an instrument of crime.  Lambert was sentenced to death for the two murders in a bifurcated proceeding.[2]

### III.   Procedural History

On March 25, 1986, Petitioner filed amended post-verdict motions for a new trial and to vacate the judgment in the Philadelphia Court of Common Pleas, citing twenty assignments of error.  Judge Geisz denied the motions by Order dated May 6, 1986, and issued an opinion on February 9, 1987.  Petitioner filed a direct appeal with the Pennsylvania Supreme Court on December 14, 1987.  On February 21, 1992, the Pennsylvania Supreme Court, in a 3-2 decision, upheld Petitioner's conviction and affirmed the sentence of death.  Commonwealth v. Lambert, 603 A.2d 568 (Pa. 1991) (Lambert-1).

Thereafter, Petitioner filed a *pro se* petition under the Post-Conviction Relief Act (PCRA), 42 Pa. Const. Stat. § 9541 *et. seq.*, in the Philadelphia Court of Common Pleas. Petitioner then retained present counsel and filed an amended PCRA petition on January 30, 1997.  Supplemental petitions were filed on July 30, 1997 and October 23, 1997.  On January 29,

---

[2]The sentencing jury found three aggravating circumstances and one mitigating circumstance.  The three aggravating circumstances were: (1) a killing while in the perpetration of a felony; (2) in the commission of the offense, the defendant knowingly created a grave risk of death to another person in addition to the victim of the offense; and (3) prior conviction for another federal or state offense committed either before or at the time of the offense at issue for which a sentence of life imprisonment or death was imposable.  42 Pa. Const. Stat. § 9711(d)(6), (7), (10).  The mitigating circumstance was the absence of significant prior criminal convictions. 42 Pa. Const. Stat. § 9711(e)(1).

3

1998, Judge Poserina denied Petitioner's PCRA petition, and Petitioner appealed to the

Pennsylvania Supreme Court.  The Pennsylvania Supreme Court affirmed Judge Poserina's

denial of post-conviction relief on December 31, 2001.  Commonwealth v. Lambert, 797 A.2d

232 (Pa. 2001) (Lambert-2).  Two justices joined the Opinion Announcing the Judgment of the

Court ("OAJ"),  three concurred in the result, and two dissented.

On May 8, 2002, Petitioner filed his second PCRA petition in the Philadelphia Court of

Common Pleas.  Petitioner filed the present habeas petition on December 12, 2002, and we

placed the case in suspense on March 6, 2003, pending exhaustion of the second PCRA petition.

Judge Poserina denied post-conviction relief on September 9, 2003, and the Pennsylvania

Supreme Court unanimously affirmed on October 18, 2005.  Commonwealth v. Lambert, 884

A.2d 848 (Pa. 2005) (Lambert-3).

## IV.    Overview of the Claims

### _____A.    Federal Habeas Petition

In his habeas petition, Petitioner raises twenty-four claims of constitutional error, most of

which are accompanied by layered allegations of ineffective assistance of counsel.  The claims

are as follows:

### 1.    Guilt Phase

(1)  The Commonwealth withheld material impeachment evidence in violation of Brady v.
     Maryland, 373 U.S. 83 (1963) and Giglio v. United States, 405 U.S. 150 (1972), by
     misrepresenting the bargain given to Jackson in exchange for his testimony.  Trial and
     appellate counsel were constitutionally ineffective under Strickland v. Washington, 466
     U.S. 668 (1984) for failing to discover and raise this claim during the post-verdict and
     direct appeal stages. ["Claim 1" or the "first Brady claim"].

(2)  The Commonwealth withheld material exculpatory and impeachment evidence in
     violation of Brady and Giglio by failing to disclose certain police documents to the

defense. ["Claim 2" or the "second Brady claim"].  These documents include:

> (a) Police activity sheet ("PAS") dated October 25, 1982.
> (b) PAS dated October 12, 1982.
> © PAS dated January 14, 1983.
> (d) PAS dated September 24, 1982.
> (e) PAS dated September 23, 1982.
> (f) Several police sketches and composites of suspects.
> (g) Documents relating to a prior murder committed by co-defendant Reese.
> (h) Statement of witness Marie Green, dated February 18, 1983.

(3)  The trial court erred in refusing to admit evidence that Jackson and Reese had committed twelve robberies together in the past.  Trial and appellate counsel were ineffective for failing to adequately object at trial and properly litigate this claim on direct appeal. ["Claim 3"].

(4)  The trial court erred in admitting Janet Ryan's identification testimony.  Trial and appellate counsel were ineffective for failing to adequately object at trial and properly litigate this claim on direct appeal. ["Claim 4"].

(5)  The trial court erred in failing to issue cautionary instructions with regard to Ryan's identification as required by Commonwealth v. Kloiber, 106 A.2d 820 (Pa. 1954) and Commonwealth v. Sexton, 400 A.2d 1289 (Pa. 1979).  Trial and appellate counsel were ineffective for failing to raise this claim at trial and on direct appeal. ["Claim 5"].

(6)  The trial court erred in admitting certain hearsay statements under the co-conspirator exception.  Trial and appellate counsel were ineffective for failing to raise this claim at trial and on direct appeal. ["Claim 6"].

(7)  The trial court gave erroneous and incomplete instructions on the effect and significance of Jackson's *crimen falsi* convictions and other evidence of his bias.  Trial and appellate counsel were ineffective for failing to raise this claim at trial and on direct appeal. ["Claim 7"].

(8)  The prosecutor engaged in improper conduct during his closing argument.  Trial and appellate counsel were ineffective for failing to raise this claim at trial and on direct appeal. ["Claim 8"].

(9)  The trial court erred in prohibiting defense counsel from taking the stand to establish Ryan's bias.  Appellate counsel was ineffective for failing to raise this claim on direct appeal. ["Claim 9"].

(10) The trial court erred in refusing to sever Petitioner's trial from the trial of co-defendant

Reese.  Trial and appellate counsel were ineffective for failing to adequately raise this claim at trial or on direct appeal. ["Claim 10"].

(11) The state courts erred in refusing to grant Petitioner an evidentiary hearing on his claims brought pursuant to <u>Batson v. Kentucky</u>, 476 U.S. 79 (1986) and <u>Swain v. Alabama</u>, 380 U.S. 202 (1965), alleging racial discrimination during the jury selection process at Petitioner's trial, and a historical policy of discrimination in jury selection by the Philadelphia District Attorney's office.   Appellate counsel was ineffective for not providing sufficient evidence to support this claim on direct appeal. ["Claim 11" or the "<u>Batson</u> claim"].   ___

(12) Defense counsel engaged in unprofessional behavior throughout the trial, thereby depriving Petitioner of effective assistance under <u>Strickland</u>, and constructively abandoning him under <u>United States v. Cronic</u>, 466 U.S. 648 (1984). ["Claim 12"].

(13) Petitioner was deprived of his right to testify at both the guilt and penalty phases of the trial.  Trial counsel was ineffective for failing to advise Petitioner of his right to testify. ["Claim 13"].

(14) Defense counsel improperly informed the jury that he was court-appointed and that Petitioner had been held in jail without bail since his arrest, thereby depriving Petitioner of his right to effective assistance of counsel.  Appellate counsel was ineffective for failing to raise this claim on direct appeal. ["Claim 14"].

## 2.    **Penalty Phase**

(15) The trial court misled the jury about the role of appellate review in violation of <u>Caldwell v. Mississippi</u>, 472 U.S. 320 (1985).  Trial and appellate counsel were ineffective for failing to raise this claim at trial and on direct appeal. ["Claim 15" or the "<u>Caldwell</u> claim"].

(16) The penalty phase jury instructions erroneously indicated that the jury had to unanimously find mitigating circumstances before it could consider them and give them effect in violation of <u>Mills v. Maryland</u>, 486 U.S. 367 (1988).  Trial and appellate counsel were ineffective for failing to raise this claim at trial and on direct appeal.  ["Claim 16" or the "<u>Mills</u> claim"].

(17) The trial court gave erroneous instructions on Petitioner's burden of proof at the penalty phase.  Trial and appellate counsel were ineffective for failing to adequately object at trial and properly litigate this claim on direct appeal. ["Claim 17"].

(18) The trial court gave erroneous instructions on the "grave risk" aggravating factor.  Trial and appellate counsel were ineffective for failing to adequately object at trial and raise

this claim on direct appeal. ["Claim 18"].

(19) Petitioner's penalty phase waivers of his right to counsel and his right to present mitigating evidence and argument were not knowing, intelligent, and voluntary. Trial counsel was ineffective for failing to dissuade Petitioner from waiving these rights. The trial court erred in not conducting a competency hearing *sua sponte*, and trial counsel was ineffective for not requesting one. Trial and appellate counsel were also ineffective for not raising and litigating these claims at trial and on direct appeal. ["Claim 19"].

(20) Defense counsel abandoned his role as an advocate under <u>Cronic</u>, and provided ineffective assistance under <u>Strickland</u> during the penalty phase by failing to present any argument or mitigating evidence. ["Claim 20"].

(21) Petitioner's death sentence was the product of improper racial discrimination. Appellate counsel was ineffective for failing to litigate this claim on direct appeal. ["Claim 21"].

(22) Petitioner did not receive meaningful proportionality review as mandated by 42 Pa. Const. Stat. § 9711(h)(3)(iii). Appellate counsel was ineffective for failing to raise this claim on direct appeal. ["Claim 22"].

(23) Trial and appellate counsel were generally ineffective for failing to adequately preserve or properly assert any of the claims set forth in the Petition. ["Claim 23"].

(24) The cumulative effect of all the errors warrants habeas relief. ["Claim 24"].

## B.   Direct Appeal

During the post-trial motions phase, Judge Geisz considered and rejected the following

claims on their merits:

- **Claim 3** - exclusion of "other crimes" evidence. <u>Commonwealth v. Lambert</u>, No. 356-368, slip op. at 15-16 (Pa. Ct. Com. Pl. Feb. 9, 1987) (Judge Geisz slip op.).

- **Claim 4** - admission of Ryan's identification testimony. Geisz, slip op. at 9-12.

- **Claim 6** - admission of hearsay statements made in the getaway car. Geisz, slip op. at 34.

- **Claim 8** - improper prosecutorial arguments. Geisz, slip op. at 38-39.

- **Claim 10** - denial of a severance. Geisz, slip op. at 13-14.

- **Claim 11** - Batson claim. Geisz, slip op. at 25.

- **Claim 17** - improper burden of proof instructions. Geisz, slip op. at 19.

7

On direct appeal, the Pennsylvania Supreme Court upheld Petitioner's conviction and affirmed his sentence of death.  Lambert-1, 603 A.2d at 580.  The court rejected each of the above-listed claims on its merits:

- **Claim 3** - 603 A.2d at 574.

- **Claim 4** - 603 A.2d at 574-575.

- **Claim 6** - 603 A.2d at 575.

- **Claim 8** - 603 A.2d at 577-579.

- **Claim 10** - 603 A.2d at 572-575.

- **Claim 11** - 603 A.2d at 577.

- **Claim 17** - 603 A.2d at 576-577.

C.    **First PCRA Proceedings**

In his first PCRA petition, Petitioner raised thirty claims of error, nineteen of which are relevant to the present habeas petition.  Judge Poserina rejected all of Petitioner's claims on either substantive or procedural grounds.  Commonwealth v. Lambert, No. 0343 2/2 and 356-368, (Pa. Ct. Com. Pl. Jan. 29, 1998) (Poserina slip op.).[3]

_____

[3] Petitioner filed three counseled briefs with the PCRA court in support of his first PCRA petition: (1) an Amended Petition dated January 28, 1997 ("First Brief"); (2) a Supplemental Petition dated July 30, 1997 ("Second Brief"); and (3) a Second Supplemental Petition dated October 23, 1997 ("Third Brief").  Judge Poserina considered all three briefs in adjudicating Lambert's PCRA petition.

The First Brief contained twenty IAC claims.  The Second Brief contained nine substantive claims of error and layered allegations of ineffectiveness.  In the Second Brief, Petitioner also asked the PCRA court to review (under the relaxed waiver doctrine) "the merits of each substantive claim" that formed the basis of the twenty IAC claims raised in the First Brief.  See Petr's Supplemental Pet. under the PCRA 1-2, ¶ 1.  Thus, for certain claims, the citation for the substantive claim of error is to the Second Brief, while the citation for the IAC claim is to the First Brief.

Additionally, many of the claims in Petitioner's First Brief alleged only trial counsel

8

| Claim Number | Disposition of the PCRA court (Judge Poserina) |
|---|---|
| **#1**<br>• <u>Brady</u> claim regarding Jackson's bargain with the state.  Petr's Second Supplement to Pet. for Post-Conviction Relief 1-5.<br><br>• Trial and appellate counsel were ineffective for failing to discover the extent of Jackson's bargain during the post-verdict and appeal stages.  <u>Id.</u> at 5. | • Rejected on the merits.  Poserina, slip op. at 36-39.<br><br><br>• Not specifically addressed. |
| **#3**<br>• Improper exclusion of evidence of "other crimes" committed by Reese and Jackson.  Petr's Supplemental Pet. under the PCRA 3-6.<br><br>• Trial and appellate counsel were ineffective for failing to properly raise and litigate this claim.  <u>Id.</u> at 6. | • Rejected as previously litigated.[4] Poserina, slip op. at 4 (# 4).<br><br><br>• Rejected as previously litigated. Poserina, slip op. at 23-24. |
| **#4**<br>• Improper admission of Ryan's identification. Petr's Supplemental Pet. under the PCRA 6-8.<br><br>• Trial and appellate counsel were ineffective for failing to properly raise and litigate this claim.  <u>Id.</u> | • Rejected as previously litigated. Poserina, slip op. at 13, 24.<br><br><br>• Rejected as previously litigated. Poserina, slip op. at 13, 24. |

---

ineffectiveness.  In the Second Brief, Petitioner alleged both trial and appellate counsel ineffectiveness with respect to all claims raised in the First Brief.  <u>See</u> Petr's Supplemental Pet. under the PCRA 2, ¶ 2.  Thus, for certain claims, the citation for trial counsel ineffectiveness is to the First Brief, while the citation for appellate counsel ineffectiveness is to the Second Brief.

[4] Under Pennsylvania's Post-Conviction Relief Act, a claim is "previously litigated" if the "highest appellate court in which the petitioner could have had review as a matter of right has ruled on the merits of the issue."  42 Pa. Const. Stat. § 9544(a)(2).

| Claim Number | Disposition of the PCRA court (Judge Poserina) |
|---|---|
| **#5**<br><br>• Inadequate identification instructions under <u>Kloiber</u> and <u>Sexton</u>.  Petr's Supplemental Pet. under the PCRA 8-11.<br><br>• Trial and appellate counsel were ineffective for failing to properly raise and litigate this claim.  <u>Id.</u> at 11. | • Rejected on the merits.  Poserina, slip op. at 24-25.<br><br>• Trial counsel ineffectiveness rejected on the merits.  Poserina, slip op. at 24-25. |
| **#6**<br>• Improper admission of hearsay: (1) Jackson's testimony regarding statements made the day after the incident; and (2) Jackson's testimony regarding his own statements to the police.  Petr's Supplemental Pet. under the PCRA 1-2, ¶1.<br><br>• Trial and appellate counsel were ineffective for failing to properly raise and litigate this claim.  Petr's Amended Pet. under the PCRA 12-13 (trial counsel); Petr's Supplemental Pet. under the PCRA 2, ¶2 (appellate counsel). | • Rejected as previously litigated.  Poserina, slip op. at 15-16.<br><br><br><br>• Rejected as previously litigated.  Poserina, slip op. at 15-16. |

| Claim Number | Disposition of the PCRA court (Judge Poserina) |
|---|---|
| **#7**<br>• Inadequate instructions on Jackson's *crimen falsi* convictions and other evidence of his bias.  Petr's Supplemental Pet. under the PCRA 1-2, ¶1.<br><br>• Trial and appellate counsel were ineffective for failing to properly raise and litigate this claim. Petr's Amended Pet. under the PCRA 10-11 (trial counsel); Petr's Supplemental Pet. under the PCRA 2, ¶2 (appellate counsel). | • Not specifically addressed.<br><br><br><br>• Trial counsel ineffectiveness rejected on the merits.  Poserina, slip op. at 11, 12. |

| Claim Number | Disposition of the PCRA court (Judge Poserina) |
|---|---|
| **#8**<br><br>• Improper prosecutorial argument:<br><br>(a) Expressing a personal belief in the credibility of Jackson and the dangerousness of Lambert.  Petr's Supplemental Pet. under the PCRA 1-2, ¶1 . | • Rejected as previously litigated.  Poserina, slip op. at 4 (#13). |
| (b) Comparing Ryan's identification to a "Polaroid picture."  <u>Id.</u> at 12. | • Rejected on the merits.  Poserina, slip op. at 25-26. |
| © Attributing Ryan's nervousness to her recognition of Lambert as the shooter.  <u>Id.</u> | • Rejected on the merits.  Poserina, slip op. at 25-26. |
| (d) Misinforming the jury on the law of accomplice liability.  <u>Id.</u> at 12-13. | • Rejected on the merits.  Poserina, slip op. at 26. |
| (e) Taking advantage of trial court's exclusion of evidence that Reese and Jackson committed prior robberies together.  <u>Id.</u> at 13-14. | • Rejected on the merits.  Poserina, slip op. at 26. |
| • Trial and appellate counsel were ineffective for failing to properly raise and litigate this claim with respect to argument (a).  Petr's Amended Pet. under the PCRA 13-14 (trial counsel); Petr's Supplemental Pet. under the PCRA 2, ¶2 (appellate counsel). | • Rejected as previously litigated and on the merits.  Poserina, slip op. at 18-20. |
| • Trial and appellate counsel were ineffective for failing to properly raise and litigate this claim with respect to arguments (b) - (e).  Petr's Supplemental Pet. under the PCRA 15. | • Trial counsel ineffectiveness rejected on the merits.  Poserina, slip op. at 26. |

| Claim Number | Disposition of the PCRA court (Judge Poserina) |
|---|---|
| **#9**<br>• Improper exclusion of evidence regarding Ryan's bias.  Petr's Supplemental Pet. under the PCRA 1-2, ¶1.<br><br>• Appellate counsel was ineffective for failing to preserve and litigate this issue on appeal.  Petr's Amended Pet. under the PCRA 12. | • Not specifically addressed.<br><br><br><br>• Rejected on the merits.  Poserina, slip op. at 13-15. |
| **#10**<br>• Improper denial of severance.  Petr's Supplemental Pet. under the PCRA 15-16.<br><br>• Trial and appellate counsel were ineffective for failing to properly raise and litigate this claim.  Id. | • Rejected as previously litigated.  Poserina, slip op. at 4 (#1).<br><br>• Rejected as previously litigated.  Poserina, slip op. at 26-27. |
| **#11**<br>• Batson claim.  Petr's Supplemental Pet. under the PCRA 16-18.<br><br>• Appellate counsel was ineffective for failing to properly raise this claim on appeal.  Id. | • Rejected as previously litigated.  Poserina, slip op. at 4 (#9).<br><br>• Rejected on the merits.  Poserina, slip op. at 27-28. |
| **#12**<br>• Defense counsel's unprofessional conduct - Strickland ineffectiveness.[5]  Petr's Amended Pet. under the PCRA 14-15. | • Rejected on the merits.  Poserina, slip op. at 20-21. |

---

[5] Petitioner presently alleges that defense counsel's unprofessional conduct amounted to: (1) ineffective assistance under Strickland; and (2) constructive abandonment under Cronic.  On PCRA review, Petitioner only raised the Strickland variant of this claim.

| Claim Number | Disposition of the PCRA court (Judge Poserina) |
|---|---|
| **#13**<br>• Denial of the right to testify at the penalty phase.[6] Petr's Supplemental Pet. under the PCRA 23.<br><br>• Trial counsel was ineffective for advising Petitioner not to testify. Id. | • Rejected on the merits. Poserina, slip op. at 35-36.<br><br>• Rejected on the merits. Poserina, slip op. at 35-36. |
| **#14**<br>• Defense counsel's improper "bail" and "court appointment" references. Petr's Amended Pet. under the PCRA 13.<br><br>• Appellate counsel was ineffective for failing to properly raise and litigate this issue. Petr's Supplemental Pet. under the PCRA 2, ¶2. | • Rejected on the merits. Poserina, slip op. at 16-18.<br><br>• Not specifically addressed. |
| **#15**<br>• Caldwell claim. Petr's Supplemental Pet. under the PCRA 18-20.<br><br>• Trial and appellate counsel were ineffective for failing to object at trial and raise this claim on appeal. Id. | • Rejected on the merits. Poserina, slip op. at 28-32.<br><br>• Trial counsel ineffectiveness rejected on the merits. Poserina, slip op. at 29. |
| **#16**<br>• Mills claim. Petr's Supplemental Pet. under the PCRA 1-2, 3.<br><br>• Trial and appellate counsel were ineffective for failing to object at trial and raise this claim on appeal. Petr's Amended Pet. under the PCRA 3. | • Rejected on the merits. Poserina, slip op. at 6.<br><br>• Trial counsel ineffectiveness rejected on the merits. Poserina, slip op. at 5-7 |

---

[6] Petitioner did not contend that he was denied the right to testify at the guilt phase until his PCRA appeal to the Pennsylvania Supreme Court (Lambert-2).

| Claim Number | Disposition of the PCRA court (Judge Poserina) |
|---|---|
| **#17**<br>• Improper burden of proof instructions during the penalty phase.  Petr's Supplemental Pet. under the PCRA 1-2.<br><br>• Trial and appellate counsel were ineffective for failing to object and properly raise this issue on appeal.  Petr's Amended Pet. under the PCRA 4-5 (appellate counsel); Petr's Supplemental Pet. under the PCRA 2, ¶2 (trial counsel). | • Rejected as previously litigated.  Poserina, slip op. at 7-8.<br><br>• Rejected as previously litigated.  Poserina, slip op. at 7-8. |
| **#18**<br>• Improper instructions and prosecutorial argument regarding the "grave risk" aggravating factor.  Petr's Supplemental Pet. under the PCRA 20-23.<br><br>• Trial and appellate counsel were ineffective for failing to object and raise this issue on appeal.  Id. at 23. | • Rejected on the merits.  Poserina, slip op. at 32-35.<br><br>• Rejected on the merits.  Poserina, slip op. at 32-35. |
| **#19**<br>• Inadequate waiver of the right to present mitigating evidence and argument during the penalty phase.  Petr's Amended Pet. under the PCRA 5-6.<br><br>• Trial counsel was ineffective for failing to dissuade Petitioner from waiving these rights.  Id. at 7, ¶6.<br><br>• Trial and appellate counsel were ineffective for failing to properly preserve and litigate this claim on appeal.  Id. at 6, ¶2. | • Rejected on the merits.  Poserina, slip op. at 8-9.<br><br>• Rejected on the merits.  Poserina, slip op. at 8-9.<br><br>• Rejected on the merits.  Poserina, slip op. at 8-9. |

| Claim Number | Disposition of the PCRA court (Judge Poserina) |
|---|---|
| **#20**<br>• Defense counsel was ineffective for failing to present mitigating evidence or argument during the penalty phase.[7] Petr's Amended Pet. under the PCRA 7-8, 9. | • Rejected on the merits.  Poserina, slip op. at 9, 10. |

On appeal, the Pennsylvania Supreme Court affirmed the PCRA court's denial of post-conviction relief in a highly fractured decision.  Lambert-2, 797 A.2d 232.  Two justices, Justice Castille and Justice Newman, joined in the reasoning of the Opinion Announcing the Judgment of the Court (OAJ).  Three justices concurred in the result only, and two dissented.   The OAJ found that many of Petitioner's claims were procedurally barred under the PCRA because Petitioner had previously litigated them,[8] or had waived them by failing to raise them on direct appeal or to the PCRA court.[9]  The remaining claims were rejected on their merits.[10]

_____

[7]Petitioner presently alleges that counsel's failure to present mitigating evidence or argument during the penalty phase amounted to both constructive abandonment under Cronic, and ineffective assistance under Strickland.  On PCRA review, Petitioner only presented the Strickland portion of this claim.

[8] The OAJ found that Claims 3, 4, 10, 11 and 17 were previously litigated because the Pennsylvania Supreme Court considered them on direct appeal.  Lambert-2, 797 A.2d at 239-240.  Moreover, Petitioner could not "revive" these previously litigated claims by alleging ineffective assistance of counsel for the manner in which they were litigated on direct appeal.  Id. Additionally, the OAJ declined to reconsider Claim 21, finding that it was previously the subject of a motion for remand which the Pennsylvania Supreme Court denied on December 20, 1999. Id. at 273 n.4.

[9] The OAJ found that ten substantive claims of error were waived because Petitioner failed to present them to the Pennsylvania Supreme Court on direct appeal: Claims 1, 5, 6, 7, 8, 9, 15, 16, 18, and part of claim 19 (inadequate waiver of right to present mitigating evidence). Lambert-2, 797 A.2d at 241 n.5.  The OAJ also found that five claims were waived because Petitioner did not raise them in his PCRA petition: Claim 24 and parts of Claims 12 (constructive abandonment under Cronic), 13 (right to testify during the guilt phase), 19 (trial court's failure to

D.      **Second PCRA Proceedings - Claim 2**

In his second PCRA petition, Petitioner alleged that the Commonwealth violated Brady and Giglio by failing to provide defense counsel with five police activity sheets, police sketches of suspects, police documents relating to a prior murder committed by Reese, and a statement made by a witness, Marie Green.  Judge Poserina rejected Petitioner's claims on the merits, finding that the undisclosed documents were not exculpatory or impeaching within the meaning of Brady.  Commonwealth v. Lambert, No. 0356-368, (Pa. Ct. Com. Pl. Dec. 11, 2003) (Poserina, second slip op.).  Additionally, Petitioner had failed to establish that his serial PCRA petition fell within any of the exceptions to the PCRA's timeliness requirements.[11]  (Poserina, second slip op. at 13).

---

conduct a competency hearing), and 20 (constructive abandonment under Cronic).  Id. at 241 n.6.

[10]  The OAJ rejected Petitioner's allegations of ineffective assistance of counsel with respect to the ten claims that were deemed waived because they were not presented on direct appeal.  Id. at 242-246.  Additionally, the OAJ rejected Claim 14 and part of Claim 13 (right to testify during the penalty phase) on the merits.  Id. at 246-248.

[11]  Under the PCRA, all petitions, including second or subsequent petitions, must be filed within one year of the date the judgment becomes final, unless the Petitioner can prove that:

(i) the failure to raise the claim previously was the result of interference by government officials with the presentation of the claim in violation of the Constitution or laws of this Commonwealth or the Constitution or laws of the United States;

(ii) the facts upon which the claim is predicated were unknown to the petitioner and could not have been ascertained by the exercise of due diligence; or

(iii) the right asserted is a constitutional right that was recognized by the Supreme Court of the United States or the Supreme Court of Pennsylvania after the time period provided in this section and has been held by that court to apply retroactively.

42 Pa. Const. Stat. § 9545(b)(1).

17

On appeal, the Pennsylvania Supreme Court unanimously affirmed Judge Poserina's denial of post-conviction relief.  Lambert-3, 884 A.2d 848 (Pa. 2005).  The court found that six[12] of the alleged Brady violations were timely raised under the PCRA because they were based on newly discovered evidence, but rejected them on their merits.  The seventh allegation, concerning the police activity sheet dated January 14, 1983, was untimely because "the facts underlying [the] claim were known or knowable to [Petitioner]" within the one year filing period.  Id. at 856.

## V.   Exhaustion and Procedural Default

Before filing a habeas petition in federal court, a petitioner must exhaust all available state court remedies.  28 U.S.C. § 2254(b)(1)(A).  In order to satisfy the exhaustion requirement, the petitioner must "fairly present . . . a federal claim's factual and legal substance to the state courts in a manner that puts them on notice that a federal claim is being asserted."  McCandless v. Vaughn, 172 F.3d 255, 261 (3d Cir. 1999).  If a petitioner fails to present his claims to the state courts in a timely manner, the claims are "procedurally defaulted."  O'Sullivan v. Boerckel, 526 U.S. 838, 848 (1999).  Procedurally defaulted claims are technically exhausted because "there are no state remedies any longer 'available' to [the petitioner]."  Coleman v. Thompson, 501 U.S. 722, 732 (1991).  A federal court may not review defaulted claims unless Petitioner can establish "cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice."  Id. at 750.

---

[12] The six timely Brady claims concerned the: (1) police activity sheet ("PAS") dated October 25, 1982; (2) PAS dated October 12, 1982; (3) PAS dated September 24, 1982; (4) PAS dated September 23, 1982; (5) police composite sketches; and (6) statement of witness, Marie Green, dated February 18, 1983.

18

**VI.**   **Relaxed Waiver**

_____Under the procedural default doctrine, a district court generally may not consider an issue of federal law arising from a state court judgment, if the judgment "rests on a state-law ground that is both 'independent' of the merits of the federal claim and an 'adequate' basis for the [state] court's decision." Harris v. Reed, 489 U.S. 255, 260 (1989). A state procedural rule is adequate only if it is "firmly established, readily ascertainable, and regularly followed." Szuchon v. Lehman, 273 F.3d 299, 325 (3d Cir. 2001).

On PCRA appeal, the Pennsylvania Supreme Court held that Lambert waived many of his claims by failing to raise them on direct appeal or in his PCRA petition. Lambert-2, 797 A.2d at 241 nn.5-6. Under Third Circuit precedent, the procedural grounds identified by the state supreme court are inadequate to bar federal habeas review, because at the time of Lambert's alleged waivers, the Pennsylvania Supreme Court did not consistently enforce its waiver rules in capital cases. Rather, it followed a "practice of reaching the merits of claims in PCRA petitions in capital cases regardless of the failure of the petition to meet the appropriate procedural criteria." Banks v. Horn, 126 F.3d 206, 214 (3d Cir. 1997). This practice, known as "relaxed waiver," was not abandoned by the Pennsylvania Supreme Court until 1998 in Commonwealth v. Albrecht, 720 A.2d 693 (Pa. 1998), after Petitioner filed his direct appeal and first post-conviction petition. See Jacobs v. Horn, 395 F.3d 92, 117 (3d Cir. 2005) ("On November 23, 1998, the Pennsylvania Supreme Court in Albrecht expressly abandoned the relaxed waiver doctrine in capital cases on PCRA appeal."). Accordingly, Petitioner has not procedurally defaulted the claims which the Pennsylvania Supreme Court deemed waived on PCRA appeal,

and we will consider them on their merits.[13]

## VII. Standard of Review under AEDPA

Under the Anti-Terrorism and Effective Death Penalty Act of 1996 ("AEDPA"), a federal

court may grant habeas relief "with respect to any claim that was adjudicated on the merits in

State court proceedings" only if the state court adjudication:

> (1) resulted in a decision that was contrary to, or involved an
> unreasonable application of, clearly established Federal law,
> as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable
> determination of the facts in light of the evidence presented
> in the State court proceeding.

28 U.S.C. § 2254(d).

A decision is "contrary to clearly established Federal law" if the state court "arrives at a

conclusion opposite to that reached by [the Supreme Court] on a question of law," or "confronts

facts that are materially indistinguishable from a relevant Supreme Court precedent and arrives at

[an opposite] result." Williams v. Taylor, 529 U.S. 362, 405 (2000).  A federal court may grant

habeas relief under the "unreasonable application" clause of § 2254(d)(1) if the "state court

correctly identifies the governing legal principle from [Supreme Court] decisions but

unreasonably applies it to the facts of the particular case."  Bell v. Cone, 535 U.S. 685, 694

---

[13] Lambert's claims also are not procedurally defaulted because the Pennsylvania
Supreme Court's opinion on PCRA appeal garnered the support of only two justices and
therefore did represent the majority's opinion.  Rather, the Lambert-2 majority (5 justices) agreed
only upon the appropriate result: to affirm Judge Poserina's denial of the PCRA petition.
Therefore, we think it is appropriate to view the OAJ as a summary affirmance of the PCRA
court, which did consider many of Petitioner's claims on their merits.  Accord Simmons v.
Beard, 356 F.Supp.2d 548, 557-58 (W.D. Pa. 2005) (treating two-justice OAJ as a "summary
disposition," and concluding that petitioner's claims were not procedurally defaulted because
OAJ "did not represent the decision of the majority").

(2002) (citing Williams, 529 U.S. at 407-08).  An objectively unreasonable application differs

from an incorrect one, and only the former warrants habeas relief.  Woodford v. Visciotti, 537

U.S. 19, 25 (2002).

      With regard to factual determinations, a federal habeas court must presume state court

findings of fact are correct.  28 U.S.C. § 2254(e)(1).  A petitioner may rebut this presumption

only by clear and convincing evidence.  Id.  Under § 2254(d)(2), a federal court may grant relief

if the state court adjudication "resulted in a decision that was based on an unreasonable

determination of the facts in light of the evidence presented in the State court proceeding."  28

U.S.C. § 2254(d)(2).

      If the state court has adjudicated a claim on its merits, we consider the claim under

AEDPA's deferential standard of review.  On the other hand, if Petitioner fairly presented a

claim to the state court (i.e., exhausted it), but the state court completely failed to address it, or

refused to consider it because of an inadequate procedural bar, we review the claim de novo.

Jacobs v. Horn, 395 F.3d 92, 100 (3d Cir. 2005) ("In cases where the AEDPA standards of

review do not apply, federal habeas courts apply pre-AEDPA standards of review."); Holloway v.

Horn, 355 F.3d 707, 718 (3d Cir. 2004) (reviewing a claim de novo because Petitioner presented

it to the Pennsylvania Supreme Court, but the court "failed to even mention" it).

      Applying these principles to the facts of this case, we will review de novo all claims

which the Pennsylvania Supreme Court held were waived on the basis of inadequate procedural

grounds.  If, however, the PCRA court adjudicated a claim on its merits, we will consider Judge

Poserina's findings under AEDPA's deferential standard of review.  See Wright v. Vaughn, 473

F.3d 85 (3d Cir. 2006) (assuming without deciding that there was an "adjudication on the merits"

when PCRA court decided an issue on the merits, but the highest state court disposed of it on

procedural grounds); Fahy v. Horn, No. Civ. A. 99-5086, 2003 WL 22017231 (E.D. Pa. Aug. 26,

2003) (treating the decision of the PCRA court as an "adjudication on the merits" for § 2254(d)

purposes when state supreme court relied on procedural grounds to deny relief).[14]

## VIII.   Standard for Ineffective Assistance of Counsel ("IAC") Claims

Petitioner claims trial and appellate counsel were constitutionally ineffective for failing to

raise or adequately pursue many of the claims asserted in this Petition.  In order to establish a

claim of ineffectiveness, Petitioner must show that counsel's performance was deficient, and the

deficient performance prejudiced his defense.  Strickland v. Washington, 466 U.S. 668 (1984).

Counsel's performance is deficient only if it "fell below an objective standard of

reasonableness."  Id. at 688.  In assessing counsel's performance, a court must begin with the

presumption that "counsel's conduct falls within the wide range of reasonable professional

assistance."  Id. at 689.   Even if Petitioner establishes that counsel's conduct was "professionally

unreasonable," the Sixth Amendment is not violated unless there is a "reasonable probability

that, but for counsel's unprofessional errors, the result of the proceeding would have been

different."  Id. at 694.  A "reasonable probability" is one that is "sufficient to undermine

confidence in the outcome" of the trial.  Id.

---

[14] The Court respectfully notes that the Third Circuit's relaxed waiver jurisprudence has
created a rather anomalous situation: defendants receive a less favorable standard of review (i.e.,
§ 2254(d)) in federal court for claims they raised in a timely fashion during the state court
proceedings, and a more favorable standard (i.e., de novo) for claims they pursued with less
diligence.

IX.     **Analysis of Guilt-Phase Claims**

A.      **Claims 1 and 2**

Both claims one and two deal with alleged constitutional violations arising out of Brady v. Maryland, 373 U.S. 83 (1963) and Giglio v. United States, 405 U.S. 150 (1972), which require the prosecutor to divulge favorable and exculpatory evidence to the defendant regardless of request, motions or other procedural issues.  Claim one is a Brady claim regarding the alleged plea agreement between co-conspirator Jackson and the Commonwealth.  Although not raised on direct appeal, this claim was considered by Judge Poserina in the first PCRA petition.  (Poserina, slip op. at 36-39).

The second Brady claim alleges that the Commonwealth failed to provide defense counsel with five police activity sheets, police sketches of suspects, police documents relating to a prior murder committed by co-defendant Reese, and a statement made by a witness, Marie Green.  This claim was raised in the second PCRA petition, and rejected by Judge Poserina on the merits, who found that the undisclosed documents were not exculpatory or impeaching.  On appeal, the Pennsylvania Supreme Court affirmed.  The court found that the allegation concerning the police activity sheet dated January 14, 1983 was waived because Petitioner raised it in an untimely manner.  Although the other six claims were held timely because they were based on newly discovered evidence, the Supreme Court rejected them on the merits.

Because claims one and two were adjudicated on their merits in state court, we will review them under AEDPA's deferential standard of review.[15]  We review de novo the related

_____

[15] Petitioner claims the Pennsylvania Supreme Court's decision in Lambert-3 is not an "adjudication on the merits" because the court failed to discuss several aspects of the legal arguments made by Petitioner.  However, in order to qualify as a merits decision, "it is not

allegation that prior counsel was ineffective: although Petitioner raised this claim in his PCRA

petition, Judge Poserina failed to address it.

With respect to the first Brady claim, the record shows that the Commonwealth called the

Chief of the District Attorney's Homicide Unit at trial to testify about the plea bargain made with

Jackson. (N.T. Apr. 17, 1984 at 71-83). The fact that the Commonwealth made a favorable

recommendation on Jackson's behalf after Jackson testified against Petitioner, does not change

the facts of the testimony presented at Petitioner's trial, that no additional deal was made with

Jackson. There is no evidence, only speculation, supporting this claim. Moreover, Jackson's

credibility was challenged at trial with extensive impeachment evidence, including his criminal

record. The trial judge also instructed the jury that, as an accomplice, Jackson's testimony came

from a corrupt source, and that his prior convictions should be considered by the jury in assessing

his credibility. (N.T. Apr. 24, 1984 at 45-47, 58-59). Thus, even if Petitioner could establish the

existence of a "secret deal" with Jackson, there is no evidence that the Commonwealth's alleged

failure to disclose this information prejudiced Petitioner. In sum, this Court cannot say, applying

§ 2254(d), that the Commonwealth violated Petitioner's rights under Brady. Trial and appellate

counsel were not ineffective for failing to pursue this meritless issue.

Likewise, as to claim two, it was reasonable for the state courts to conclude that the

---

necessary for the state court to have thoroughly explained its analysis in its opinion." Wright v.
Vaughn, 473 F.3d 85, 91 (3d Cir. 2006) (quoting Chadwick v. Janecka, 302 F.3d 107, 116 (3d
Cir. 2002)).

    Although the Pennsylvania Supreme Court did not specifically review the merits of the
Brady claim relating to the police activity sheet dated January 14, 1983, the PCRA court did.
(Poserina, second slip op. at 10-11). Under the principle articulated in Fahy v. Horn, No.Civ.A.
99-5086, 2003 WL 22017231 (E.D. Pa. Aug. 26, 2003), we will consider Judge Poserina's
decision to be an "adjudication on the merits" under § 2254(d), and apply AEDPA's deferential
standard of review. See supra pp. 21-22.

alleged <u>Brady</u> and <u>Giglio</u> violations were not material to Lambert's guilt, considering the Commonwealth's evidence and overall circumstances of the case.  The various notations and statements which Petitioner claims the Commonwealth should have disclosed are entirely ambiguous, and would have required the state courts to speculate to conclude they were favorable for Lambert and material to his guilt or punishment.  Furthermore, many of the police activity sheets clearly were part of the preliminary stages of the police investigation, and "[w]e know of no constitutional requirement that the prosecution make a complete and detailed accounting to the defense of all police investigatory work on a case."  <u>Moore v. Illinois</u>, 408 U.S. 786, 795 (1972).  The state court decisions to this effect were not unreasonable.

**B.**   **Claims 3, 4, 5 and 10**

**1.**   **Claim 10**

Claim 10 asserts improper denial of severance.  Because this issue also impacts claims 3, 4 and 5, we will discuss claim 10 first.  Initially, the Court notes that motions to sever are commonly made when more than one defendant are indicted together, because virtually every defense lawyer believes the client will fare better if tried as a single defendant.  Often, a major ground for severance is the fact that some evidence will be introduced against one defendant that is inadmissible against the other, and the jury will likely find it difficult to compartmentalize the evidence and consider it only with respect to one defendant.

For many years Pennsylvania required that defendants charged with murder have separate trials.  This rule was abrogated well before Lambert's trial, and joint trials of defendants in murder cases have become commonplace in Pennsylvania.  In fact, both the Pennsylvania and federal systems <u>favor</u> joint trials for defendants in conspiracy cases.  <u>See,e.g.</u>, <u>Commonwealth v.</u>

Jones, 668 A.2d 491, 501 (Pa. 1995) ("Where . . . defendants have been charged with conspiracy,

joint rather than separate trials are preferred."); Zafiro v. United States, 506 U.S. 534, 537 (1993)

("There is a preference in the federal system for joint trials of defendants who are indicted

together.").  Both Pennsylvania and federal law on severance leave the decision to sever in the

discretion of the trial judge.

        In this case, Petitioner's counsel raised the issue of severance in a pre-trial motion, and

verbally renewed the motion at two subsequent points.  (N.T. Mar. 23, 1984 at 9-37, 54-85; Apr.

9, 1984 at 100-104; Apr. 12, 1984 at 69).  After hearing extensive oral argument and carefully

considering the issues, Judge Geisz denied Lambert's motion for severance.  The Pennsylvania

Supreme Court affirmed on direct appeal.  Lambert-1, 603 A.2d at 572-575.[16]  Accordingly, we

review the state court decisions under § 2254(d) and find that Petitioner has failed to show any

constitutional violation resulted from the fact that the severance was not granted.

        The case law is clear that the denial of a severance does not ordinarily violate any federal

constitutional rights.  See Zafiro, 506 U.S. 534 (1993).  Because severance is a "discretionary

---

        [16] Petitioner raised this claim again in his first PCRA petition, and further alleged that
trial and appellate counsel were ineffective for failing to properly raise and litigate it.  Judge
Poserina rejected both the substantive claim of error and related IAC claim as "previously
litigated."  As the court recognized in Alford v. Johnson, No. Civ.A. 00-683, 2006 WL 516768
(E.D. Pa. Mar. 1, 2006), a "previously litigated" finding by a PCRA court does not mean that a
claim is procedurally defaulted.  Rather, it is an "affirmance of the underlying state court ruling,
and should be treated as such on federal habeas review."  Id. at *5.
         In this case, the "underlying state court ruling" is the Pennsylvania Supreme Court's
decision on direct appeal (Lambert-1).  The Lambert-1 court only considered the underlying
claim of error and not the related ineffectiveness claim at issue here.  Thus, in resolving the IAC
claim, we will consider the direct appeal decision under § 2254(d), to the extent it relates to the
ineffectiveness claim presently before this Court.  See Alford, 2006 WL 516768, at *6
(reviewing the Superior Court's decision on direct appeal "insofar as it is relevant to the
ineffective assistance claims before me").

decision," Petitioner bears the "heavy burden [of] . . . demonstrat[ing] clear and substantial

prejudice resulting in a manifestly unfair trial." United States v. Price, 13 F.3d 711, 718 (3d Cir.

1994) (internal quotations omitted). We cannot say, applying AEDPA's deferential standard of

review, that Judge Geisz's denial of a severance rendered Petitioner's trial "manifestly unfair."

Although Reese sought to prove that Lambert was the shooter, "co-defendants' attempts to cast

blame on one another are, as a general rule, insufficient" to warrant a severance. Laird v. Horn,

159 F.Supp.2d 58, 97 (E.D. Pa. 2001). Additionally, there is no evidence that "clear and

substantial prejudice" resulted from the exclusion of evidence that Jackson and Reese committed

prior crimes together. Accordingly, the trial judge's denial of a severance does not warrant

habeas relief.

Trial and appellate counsel generally raised this issue below, and were not ineffective for

failing to raise all of the "constitutional bases for relief" Petitioner now asserts. (Petr's Br. 65).

Such conduct does not fall below an "objective standard of reasonableness" within the meaning

of Strickland.

### 2.   Claim 3

Claim three asserts that the trial judge improperly prohibited Petitioner from presenting

the defense that Reese and Jackson committed the robbery and murder, by not allowing

Petitioner to show that Reese and Jackson committed a series of twelve similar robberies

together. Specifically, Petitioner asserts that he did not have sufficient latitude in cross

examining Jackson about these other crimes. Judge Geisz rejected this claim on the merits and

the Pennsylvania Supreme Court affirmed on direct appeal. (Geisz, slip op. at 15-16; Lambert-1,

603 A.2d at 574). Accordingly, we review this claim under AEDPA's deferential standard of

review.[17]

The Third Circuit addressed a similar claim in Wright v. Vaughn, 473 F.3d 85 (3d Cir. 2006), and found that although the confrontation clause and the due process clause protects a criminal defendant's right to question witnesses, evidentiary rulings in violation of the confrontation clause are subject to harmless error analysis.  Moreover, because Lambert is a habeas petitioner, he must show that the trial court's decision to curtail his cross examination was contrary to, or involved an unreasonable application of, clearly established Supreme Court precedent.  28 U.S.C. § 2254(d)(1); see also Carey v. Musladin, 127 S.Ct. 649, 653 (2006) (reemphasizing that "clearly established federal law in § 2254(d)(1) refers to the holdings, as opposed to the dicta, of this Court's decisions") (internal quotations omitted).   Lambert is unable to meet this heavy burden.

Judge Geisz's exclusion of "other crimes" evidence was obviously necessary because Petitioner and Reese were jointly tried, and such evidence would have been severely prejudicial to Reese.  Petitioner misstates the trial record because Jackson was in fact cross examined about other crimes: the trial court simply forbade Jackson from making any references to Reese, who was standing trial along with Petitioner.  This ruling was appropriately designed to protect Reese from the jury hearing about other crimes Reese had committed.  Because Jackson was cross examined about his other crimes, Petitioner was not prejudiced from the mere omission of the testimony that Reese allegedly participated with Jackson in these other crimes.  This ruling does

---

[17] Petitioner also raised an IAC claim in his first PCRA petition, which Judge Poserina rejected as previously litigated.  The Court will consider the Pennsylvania Supreme Court's decision on the underlying claim of error under § 2254(d), to the extent it relates to the ineffectiveness claim presently before this Court.  See supra n.16.

not amount to a constitutional violation.

In sum, Petitioner has failed to show that the Pennsylvania Supreme Court's decision was an unreasonable application of relevant Supreme Court standards.  Trial and appellate counsel generally raised this issue below, and were not ineffective for failing to raise all of the "constitutional bases for relief" which Petitioner now asserts.  (Petr's Br. 65).  Such conduct does not fall below an "objective standard of reasonableness" within the meaning of Strickland.

### 3.    Claim 4

Claim four asserts that the trial court violated Petitioner's constitutional rights by admitting Ryan's identification testimony.  Petitioner raised this issue in post-trial motions and Judge Geisz denied it on the merits.  (Geisz, slip op. at 9-12).  The Pennsylvania Supreme Court affirmed on direct appeal.  Lambert-1, 603 A.2d at 575.  Accordingly, we apply AEDPA's deferential standard of review, and find that the state court decisions were not unreasonable applications of Supreme Court precedent.[18]

This claim also relates to the issue of severance because, as a result of the trial court's denial of a severance, Ms. Ryan's testimony identifying Petitioner was introduced at trial.  As noted above in the factual discussion, when Ryan was first called as a witness for the Commonwealth, she was unable to identify the gunman in the bar.  However, when Reese called her as his witness, she changed her prior testimony and identified Petitioner as the shooter.  As a result of Petitioner being tried with Reese, the testimony of Ms. Ryan resulted in damaging

---

[18] Petitioner raised an IAC claim in his first PCRA petition which Judge Poserina rejected as previously litigated.  Again, the Court will consider the Pennsylvania Supreme Court's decision on the underlying claim of error under § 2254(d), to the extent it relates to the ineffectiveness claim presently before this Court.  See supra n.16.

29

evidence against Petitioner.  However, witnesses are frequently recalled and frequently change their minds, sometimes between direct and cross examination in a matter of minutes.  Some witnesses, when recalled, can remember facts or identifications that they were unable to make at an earlier time.  Of course, there was no way Judge Geisz could have anticipated this development when he denied a severance.

Moreover, the Court finds that the circumstances under which Ms. Ryan changed her testimony did not deprive Petitioner of a constitutional right.  It is clear that when Ms. Ryan testified the first time, she did not identify Petitioner.  Therefore, her first observation of Petitioner in the courtroom during the murder trial did not result in her identification.  There is no evidence that anything suggestive or improper occurred between the first time she testified at the trial, as a prosecution witness, and the second time, when she was recalled by Reese.  From the record, the only fact that can be inferred is that she changed her mind based on her recollection.  Of course, this all took place in front of the jury, and it was for the jury to assess her credibility and decide whether to credit her testimony that Petitioner was the shooter, when she was previously unable to identify anyone.  Prior counsel was not ineffective for the manner in which he pursued this issue.

### 4.    Claim 5

The denial of a severance is also relevant to the fifth ground raised by Petitioner relating to improper identification instructions.  Petitioner alleges that because Ms. Ryan never identified Lambert in a pre-trial lineup, Judge Geisz seriously prejudiced Petitioner by allowing Ms. Ryan to identify Petitioner for the first time in the courtroom.  Because of these highly suggestive circumstances, Petitioner contends that the court erred in not instructing the jury to consider Ms.

30

Ryan's identification testimony with "caution," which Petitioner claims was a deprivation of constitutional dimensions. This claim was raised for the first time on PCRA review and Judge Poserina rejected it on the merits. (Poserina, slip op. at 24-25). Accordingly, we subject the PCRA court's decision to AEDPA's deferential standard of review.[19]

The Court finds that Judge Geisz properly instructed the jury on how to receive identification testimony. During the jury charge, Judge Geisz explained:

> Where the opportunity for positive identification is good and the witness is positive in his identification, and his identification is not weakened by a prior failure to identify but remains even after cross-examination positive and unqualified, the testimony as to identification need not be received with caution.
>
> On the other hand, where the witness is not in a position to clearly observe the accused but he is not positive as to identity, or his positive statements as to identity are weakened by qualification, or failure to identify the defendant on one or more prior occasions, the accuracy of that identification is so doubtful that the court must warn the jury that the testimony as to identity must be received with caution.

(N.T. Apr. 24, 1984 at 25-26). Petitioner cites no authority requiring the trial judge to instruct the jury that it must receive a specific witness's testimony with caution. Judge Geisz's general identification instruction was appropriate and was all that the law requires.

For these reasons, relating to Claims 3, 4, 5 and 10, this Court cannot find any grounds, applying deferential review, to grant Petitioner relief.

**C.    Claim 6**

Claim six alleges that the trial court improperly admitted three sets of hearsay statements:

---

[19] In his first PCRA petition, Lambert also alleged that trial and appellate counsel were ineffective. Judge Poserina rejected the allegation of trial counsel ineffectiveness on the merits, but failed to address the appellate IAC claim. We review the trial IAC claim under AEDPA's deferential standard of review, and the appellate IAC claim de novo. Under either standard, Petitioner's ineffectiveness claims fail as the underlying claim of error lacks merit.

(1) Jackson's testimony regarding statements made by Reese in the getaway car (N.T. Apr. 11, 1984 at 32, 111); (2) Jackson's testimony regarding statements made by Reese the day after the incident (N.T. Apr. 12, 1984 at 37-38); and (3) Jackson's testimony regarding statements he made to the police about the shooting.  (Id. at 134-35, 139).  In his post-trial motions and on direct appeal, Petitioner only challenged the admission of statements made in the getaway car. Judge Geisz denied the claim based on the co-conspirator exception to the hearsay rule, and the Pennsylvania Supreme Court affirmed on direct appeal.  (Geisz, slip op. at 34; Lambert-1, 603 A.2d at 574-75).  On PCRA review, Petitioner challenged the statements made the day after the shooting, and the statements made by Jackson to the police, and further alleged that prior counsel was ineffective.  Poserina rejected these claims as previously litigated.  (Poserina, slip op. at 15-16).[20]

With regard to the statements allegedly made by Petitioner in the getaway car, we find there was no constitutional violation, and the state court's decision to this effect was not contrary to or an unreasonable application of Supreme Court precedent.  The admission of co-conspirator statements has long been allowed in both state and federal courts, and is part of the Federal Rules of Evidence.  See Fed. R. Evid. 801(d)(2)(E) (co-conspirator statements made "during the course and in furtherance of the conspiracy" are not hearsay).  It is well-established that statements made by co-conspirators in a getaway car promptly after a crime are made in furtherance of the

---

[20] The Court notes that Crawford v. Washington, 541 U.S. 36 (2004) (holding that testimonial hearsay is inadmissible against a criminal defendant unless the declarant is unavailable and defendant had a prior opportunity for cross-examination), does not apply to this Petition because Crawford was decided while Petitioner's second post-conviction petition was pending in state court.  See Whorton v. Bockting, 127 S.Ct. 1173 (2007) (Crawford announced a "new rule" of procedural law, and therefore does not apply retroactively to defendants whose convictions were final when it was decided).

conspiracy, and therefore are admissible against other conspirators.

As to the statements allegedly made the day after the shootings, the Court notes that this portion of the claim was never adjudicated on the merits in state court.  Although Petitioner raised this claim for the first time in his first PCRA petition, Judge Poserina found it was previously litigated.  Presumably, Judge Poserina was referring to the fact that Judge Geisz and the Pennsylvania Supreme Court previously considered Petitioner's claim relating to hearsay statements made in the getaway car.  Because the claim relating to the "next-day" statements was exhausted in state court, but not reviewed on the merits, we will consider it de novo.

Even under a de novo standard of review, however, we find there was no constitutional error in admitting these statements.  Jackson's testimony clearly demonstrates that these statements were part of the conspirators' efforts to avoid detection, and thus they fall within Pennsylvania's co-conspirator hearsay exception.  Jackson testified:

> **Jackson:** [The conversation] was about what was to be said as far as if anyone's arrested and it was explaining to me that Lambert had did all the shooting.
>
> **Meyers:** Well, did – what did Reese tell you?  If you were arrested, what were you supposed to do?
>
> **Jackson:** Not to say nothing, nobody knew who I was, just to be quiet.

(N.T. Apr. 12, 1984 at 38).  These statements could "reasonably be considered part of a continuing course of criminal conduct emanating from the substantive offense" and were therefore properly admitted by Judge Geisz.  Commonwealth v. Cull, 656 A.2d 476, 482 (Pa. 1995).

Finally, Petitioner challenges Jackson's testimony about the statements he made to the police about the shooting.  (N.T. Apr. 12, 1984 at 134-35, 139).  Petitioner contends that because

Jackson did not witness the shooting, his statements to the police that Petitioner was the shooter were necessarily hearsay and should have been excluded. (Pet. ¶ 74). Judge Poserina found that this issue was previously litigated when in fact it was not. Accordingly, we review it de novo and find there was no constitutional error.

During trial, counsel for co-defendant Reese cross-examined Jackson about a statement Jackson gave to the police on January 14, 1983. Jackson initially acknowledged making a statement that "[a]fter the robbery in the Prince's Lounge, Monk, James Lambert, told me that he had shot two guys with a gun." (N.T. Apr. 12, 1984 at 135). This statement was elicited without any objection by Irwin, and was repeated again, also without objection. Indeed, Lambert's counsel said "[k]eep your voice up, please." (Id. at 135-36). Although Jackson acknowledged making the statement, he then asserted that it was not truthful, testifying: "No. Monk didn't tell me that he shot anyone." (Id. at 136).

Initially, the Court finds that Irwin had good reason not to object to the initial testimony about the prior statement, as he may have had reason to understand that Jackson was going to disavow the truthfulness of it. Irwin later objected when Reese's counsel asked Jackson whether Jackson lied to the police. (Id. at 137). Jackson responded that he was trying to answer the question, and "[s]omething have to be wrong with the statement or something." (Id.). Although Jackson acknowledged signing the statement, he claimed he did not make the statement "in that manner," or that the detective "didn't get it down quite right." (Id.). Jackson implied the detectives "were mistaken in putting down . . . that Monk or James Lambert told [Jackson he did the shooting.]" (Id. at 139).

The Court cannot discern that the trial judge made any error in admitting this testimony,

34

principally because there were no objections.  The Court also rejects any suggestion that

Lambert's trial counsel was constitutionally ineffective for failing to object to this testimony

because Irwin had a strategically sound basis for not doing so.  Jackson had testified on direct

examination that Lambert was the shooter in the bar, and thus his contradictory testimony on

cross examination greatly impugned his credibility.

However, the most fundamental reason this claim is unfounded is that the testimony was

not hearsay.  Rather, it was the impeachment of a Commonwealth witness on a prior statement

given to the police.  For all these reasons, the Court finds no constitutional error in the admission

of this testimony.

**D.**   **Claim 7**

Petitioner alleges that the trial court gave erroneous and incomplete instructions on the

effect and significance of Jackson's crimen falsi convictions and other evidence of his bias.

Specifically, Petitioner claims the trial court erred by "obliquely" informing the jury that

evidence of Jackson's prior convictions "went only to his 'qualifications' as a witness," and by

failing to instruct the jury that Jackson's open cases were "powerful evidence" of bias.  (Petr's

Br. 97).  Petitioner raised this claim in his first PCRA petition, but Judge Poserina addressed it

only as a claim of trial counsel ineffectiveness.  (Poserina, slip op. at 11-12).  We will review the

PCRA court's decision under § 2254(d), to the extent it relates to the substantive claim of error

we are now considering.  See Albrecht v. Horn, 485 F.3d 103, 116 (3d Cir. 2007) (declining to

review a substantive claim of error de novo where state supreme court considered it only "in the

context" of an IAC claim).

During the jury charge, Judge Geisz adequately explained the significance of crimen falsi

35

impeachment evidence, noting that the jury could consider Jackson's prior convictions "in deciding whether or not to believe all or part of the witness' testimony." (N.T. Apr. 24, 1984 at 46). Moreover, Judge Geisz explained that the jury could take into account "the type of crime charged, how long ago it was committed and how the conviction may affect the likelihood that Bernard Jackson has testified truthfully in this case." (Id. at 46-47). After giving the initial charge, Judge Geisz met with counsel in chambers to discuss any suggested clarifications or corrections to the charge. Cannon, counsel for co-defendant Reese, asked the judge to supplement his instruction on Jackson's prior crimes to include the fact that Jackson was previously convicted of larceny and receiving stolen goods. (Id. at 48-49, 51). When the judge resumed charging the jury, he supplemented his instructions to this effect, stating:

> It was brought out, I think, during cross-examination [that Jackson] was also convicted of a larceny and some other offense. Those are also for you to take into consideration as to his qualifications as a witness.

(Id. at 58-59).

Petitioner's contention that "the jury was obliquely informed that evidence of [Jackson's] prior convictions went only to his 'qualifications' as a witness," improperly focuses on Judge Geisz's supplemental charge, and completely ignores the more detailed instructions previously given. (Petr's Br. 97). It is "well-established" that a "single instruction to a jury may not be judged in artificial isolation, but must be viewed in the context of the overall charge." Cupp v. Naughten, 414 U.S. 141, 146-47 (1973) (citing Boyd v. United States, 271 U.S. 104, 107 (1926)). Viewing Judge Geisz's charge on crimen falsi impeachment evidence in its entirety, it is clear there was no constitutional error.

The record also belies Petitioner's claim that the trial court inadequately instructed the jury

on the "effect and significance" of several open cases against Jackson.  Judge Geisz generally

instructed the jury on witness bias:

> You should consider what the witness' interest, if any, may be in your verdict.  If the witness was an interested witness, did that in any way color the testimony or cause false testimony to be given and the withholding of truth?  You have a very important duty to perform.  This case is important to the defendants.  This case is also important to the Commonwealth.

(N.T. Apr. 24, 1984 at 19).

He also noted that because Jackson was an accomplice, the jury should "examine [his]

testimony closely and accept it only with caution and care."  (Id. at 45).  Although Judge Geisz

did not inform the jury that Jackson's open cases may have biased him in favor of the

Commonwealth, Petitioner cites no authority requiring such a specific instruction.  Rather, this

was a point that defense counsel was free to make to the jury, and Irwin did in fact make during

his closing argument.  See N.T. Apr. 23, 1984 at 124-26 ("Do you think that judge is going to

give [Jackson] some more time for those robberies that he's pleading guilty to on top of what he

gets for pleading guilty to this case?").

In sum, the Court finds that Judge Geisz's instructions sufficiently guided the jury in

assessing the credibility of Jackson's testimony, and Judge Poserina's decision to this effect was

not contrary to or an unreasonable application of federal law.  Prior counsel was not ineffective

for failing to raise this meritless claim.

### E.    Claim 8

Petitioner claims he was denied due process because during closing arguments the

prosecutor improperly: (1) compared Ryan's identification to a "Polaroid picture" (Pet. ¶ 89); (2)

attributed Ryan's nervousness to her recognition of Lambert as the shooter (Id. ¶ 90); (3)

misinformed the jury on the law of accomplice liability (<u>Id.</u> ¶ 91); (4) expressed a personal belief in the credibility of Jackson and the dangerousness of Lambert (<u>Id.</u> ¶ 92); (5) took advantage of the trial court's exclusion of evidence that Reese and Jackson committed prior robberies together (<u>Id.</u> ¶ 93); and (6) took advantage of the trial court's admission of Reese's alleged claims that Petitioner was the shooter (<u>Id.</u> ¶ 94).

In post-trial motions and on direct appeal, Petitioner challenged two of the allegedly improper arguments: (1) the prosecutor's expression of a personal belief in Jackson's credibility and Lambert's dangerousness (¶ 92); and (2) the prosecutor's reference to Reese's claims that Lambert was the shooter (¶ 94). Judge Geisz considered and rejected these claims on their merits, and the Pennsylvania Supreme Court affirmed. (Geisz, slip op. at 38-39; <u>Lambert-1</u>, 603 A.2d at 577-79). In his PCRA petition, Lambert challenged four additional aspects of the prosecutor's closing argument (¶¶ 89-91, 93), which Judge Poserina denied on the merits.[21] (Poserina, slip op. at 18-20, 25-26). We review the state court decisions under AEDPA's deferential standard of review.

After carefully considering the allegedly improper statements, we find they were not so severe as to violate Petitioner's constitutional rights. The prosecutor's comments on Ryan's identification testimony (¶¶ 89-90) were well within the bounds of propriety, and invited the jury to draw reasonable inferences from the events of trial. Furthermore, during the jury charge,

---

[21] Petitioner again challenged the prosecutor's allegedly improper expression of his personal belief in the credibility of Jackson and dangerousness of Lambert. <u>See</u> Petr's Amended Pet. under the PCRA, 13-14 (raising claim in context of ineffective assistance); Supplemental Pet. under the PCRA, 1-2, ¶ 1 (urging the PCRA court to consider substantive claims of error on their merits pursuant to relaxed waiver doctrine). Judge Poserina first found that the underlying claim of error and related ineffectiveness claim were previously litigated on direct appeal, but then considered and rejected the IAC claim on its merits. (Poserina, slip op. at 4, 18-20).

Judge Geisz cautioned the jurors that "opinions expressed by counsel should not draw you to your conclusions unless supported by evidence and the inference properly drawn therefrom." (N.T. Apr. 24, 1984 at 15).  Thus, the jurors were aware that they should interpret Ryan's demeanor on the stand, and decide whether or not to credit her identification testimony, based on the evidence presented at trial and not on counsel's opinion.

With regard to accomplice liability (¶ 91), the prosecutor remarked that if Jackson witnessed the shooting "it would still put him in the same position of liability as if he was the getaway driver, as if he was the lookout, as if he was the shooter.  That's the law.  That's accomplice liability."  (N.T. Apr. 23, 1984 at 204-05).  Although this statement failed to specify that an accomplice must possess the specific intent to kill in order to be liable for first degree murder, we do not think this isolated remark "so infected the trial with unfairness as to make the resulting conviction a denial of due process."  Donnelly v. DeChristoforo, 416 U.S. 637, 643 (1974).  The prosecutor clearly specified that "[h]is honor will instruct you on the complete legal instruction of accomplice liability and conspiracy."  (N.T. Apr. 23, 1984 at 205).  During the jury charge, Judge Geisz carefully explained that a person is an accomplice "if with the intent of promoting or facilitating the commission of the crime, he solicits the other person to commit [the crime] or aids, agrees to aid or attempts to aid the other person in planning or committing [the crime]." (N.T. Apr. 24, 1984 at 37) (emphasis added).  Thus, there was no constitutional error.

We likewise reject Petitioner's claim that the prosecutor "impermissibly bolstered [Jackson's] credibility by expressing his personal belief in the need for, and credibility of, his witness."  (Pet. ¶ 92).   It is well-established that a "prosecutor may not properly vouch for the credibility of a government witness."  United States v. Molina-Guevara, 96 F.3d 698, 704 (3d

Cir. 1996).  In order to establish vouching, Petitioner must show that: (1) the prosecutor assured the jury that the testimony of a government witness is credible; and (2) this assurance was based on the prosecutor's personal knowledge or other information not contained in the record.  United States v. Saada, 212 F.3d 210, 225 (3d Cir. 2000).  In this case, the prosecutor simply observed that "Jackson earned his deal with the Commonwealth the hard way," and explained to the jury that the Commonwealth will sometimes "make . . . a deal with [other perpetrators in order] to get to what we consider are the more serious people."  (N.T. Apr. 23, 1984 at 198-99).  The prosecutor's comment on the Commonwealth's plea bargain with Jackson by no means assured the jury that Jackson was a credible witness.  Accordingly, Petitioner's vouching claim is without merit.

Petitioner further contends that the prosecutor improperly suggested that Jackson's knowledge of the .32 caliber gun came from his participation in the crime, even though Jackson could have known about the gun from prior robberies he committed with Reese.  (Pet. ¶ 93).  During his closing argument, the prosecutor observed:

> So how did [Jackson] know that to come up with the number as the .38 and the .32 caliber gun?  How does he know that the .38 weapon was the shooting weapon? How does he know that?  The police didn't tell him that.  I submit to you it's because he saw the weapon before and after the robbery and saw the two spent shells. . . .

(N.T. Apr. 23, 1984 at 201).

Contrary to Petitioner's assertions, the prosecutor clearly focused on the fact that Jackson knew the .38 caliber gun was the shooting weapon.  This information certainly could not have been gained from Jackson's participation in previous robberies.  In any event, the prosecutor's passing reference to the presence of the .32 caliber gun did not deprive Petitioner of due process.

Petitioner's final claim that the prosecutor "took advantage of the erroneous admission of

Reese's alleged claims that Petitioner was the shooter" is equally meritless.  (Pet. ¶ 94).  The prosecutor's reference to evidence admitted by the trial court is wholly appropriate and does not establish a denial of due process.

Trial counsel was not ineffective for failing to raise any of these meritless objections.  Regarding appellate IAC, Petitioner contends that even though "appellate counsel raised some challenges to the propriety of the prosecutor's argument [on direct appeal], he failed to raise the misconduct alleged here."  (Petr's Br. 105).  The Court rejects Petitioner's argument because we have found that the prosecutor's closing argument was constitutionally adequate.  Accordingly, Irwin was not ineffective for failing to challenge certain portions of it on appeal.

### F.    Claim 9

Petitioner contends he was denied the constitutional right to present a defense, confrontation, and due process because the trial court prohibited defense counsel from withdrawing and testifying about Janet Ryan's relationship with the mother of co-defendant Reese.  This claim was raised in Lambert's first PCRA petition, but Judge Poserina considered it only as a claim of ineffectiveness.  (Poserina, slip op. at 13-15).  We will review the PCRA court's decision under § 2254(d), to the extent it relates to the substantive claim of error we are now considering.  See Albrecht, 485 F.3d at 116 (state supreme court addressed claim of error in the context of an IAC claim; Petitioner did not argue that the habeas court should review the substantive claim de novo, "nor would such an argument have merit").

Irwin claimed that during the trial, Reese's mother informed him that after seeing and speaking with Ryan, she knew who Ryan was.  (N.T. Apr. 19, 1984 at 90).  Ryan, however, testified that she did not know Reese's mother or wife.  (Id. at 49).  During an in-chambers

conference, Irwin told the judge he would like to call Reese's mother and question her about their conversation, but was "sure" she would deny ever speaking with Irwin about Ryan.  (Id. at 90).  Accordingly, Irwin asked Judge Geisz to permit him to withdraw from the case, appoint other counsel, and allow Irwin to testify about his conversation with Mrs. Reese.  (Id. at 91).  Judge Geisz refused, finding that Irwin's proposed testimony was not material or relevant.  (Id. at 92).

On PCRA review, Judge Poserina agreed with Judge Geisz that defense counsel's proposed testimony was irrelevant.  (Poserina, slip op. at 15).  Additionally, he observed that because Irwin had already impeached Ryan, "[t]he fact that [this] particular line of impeachment . . . was not pursued was at most harmless error."  (Id.)  We agree.  First, Irwin never called Mrs. Reese and so she never actually denied speaking with Irwin.  Thus, his request to withdraw as counsel was based on a purely speculative chain of events.  Second, it was reasonable for both Judge Geisz and Judge Poserina to conclude that defense counsel's proposed testimony was irrelevant or immaterial.  Irwin's offer of proof consisted only of the following statement:

> In the hall this week, Bruce Reese's mother, Bruce Reese's wife were talking to me . . . and his mother . . . indicated to me that she did not know who Janet Ryan was initially but now that she saw her and had an opportunity to speak with her, that she knows who she is.

(N.T. Apr. 19, 1984 at 90).

Based on this vague assertion that Mrs. Reese recognized Janet Ryan, it was entirely proper for Judge Geisz to refuse to remove Irwin and appoint new counsel mid-way through the trial.  There was no constitutional error and habeas relief cannot be granted on this basis.  Appellate counsel was not ineffective for choosing not to include this meritless issue in his appeal.

G.    **Claim 10**

Petitioner claims the trial court's refusal to sever his trial from co-defendant Reese's denied him his constitutional right to due process.  We have already addressed and rejected this claim (see supra pp. 25-27) and will not repeat the discussion here.

H.    **Claim 11**

Petitioner alleges that the Commonwealth exercised its peremptory strikes in a racially discriminatory manner in violation of Batson v. Kentucky, 476 U.S. 79 (1986)[22] and Swain v.Alabama, 380 U.S. 202 (1965).  During voir dire, the prosecutor objected to Irwin questioning a potential juror about the economic hardships of jury service.  Irwin responded that in the future he would ask the court to question jurors about hardships "even though Mr. Meyers [the prosecutor] had asked several black jurors about hardships."  (N.T. Apr. 4, 1984 at 60).  Meyers remarked that he did not understand why Irwin had referenced the race of the jurors again,[23] and Irwin explained:

> For the same reason that you perempted Mr. Brooks, the same reason you perempted Miss Torres.  And I think it's obvious there's nothing wrong with Mr. Brooks except he was black.  He was articulate, educated but the record speaks for itself and your conduct speaks for itself.  I shouldn't have to explain it to you.

---

[22]Jury selection for Petitioner's trial took place in April 1984, about two years before the Supreme Court decided Batson v. Kentucky, 476 U.S. 79 (1986).  The Court decided Batson while Lambert's post-trial motions were pending in the Philadelphia Court of Common Pleas.  Thus, Batson applies to this Petition.  See Griffith v. Kentucky, 479 U.S. 314 (1987) (holding that Batson applies retroactively to federal convictions pending on direct review when Batson was decided).

[23]Respondents suggest that Meyers said "again" because earlier during voir dire Irwin asked a potential juror if he could be fair and impartial "even though Mr. Lambert is black and you're white," and if he thought "black people commit more crimes than whites."  (N.T. Apr. 3, 1984 at 66, 68).

(Id. at 61).

Meyers retorted that he "didn't realize there were eight white jurors selected already." (Id.).  In response, Judge Geisz noted that Irwin's "observations [were] without merit" and "peremptories do not have to be explained."  (Id.).  Irwin then pointed out that there was a "new panel decision by Judge Stout and Judge Gelfand adopting the procedures in Massachusets [sic] and California that you just can't indiscriminately use peremptories because of race which is a noted characteristic of this district attorney's office."  (Id. at 62).  Judge Geisz concluded the discussion by stating that he was "following the law of Pennsylvania."  (Id.).

In post-trial motions, Petitioner made a bare allegation that the prosecutor's use of peremptory challenges was "racially motivated" and "biased."  (Geisz, slip op. at 7).  Judge Geisz denied the claim, noting that Lambert did not "specify the exact number of illegal challenges alleged to have been made," or "cite[] any place in the record in support of such unproven allegations."  (Id. at 25).  Moreover, the judge's own examination of the record revealed that the venirepersons' races were never recorded, and defense counsel never asked the court to create such a record.  Accordingly, the court found that the claim lacked a factual basis and dismissed it as "indefinite and unfounded."  (Id.).

On direct appeal to the Pennsylvania Supreme Court, Petitioner contended that the prosecutor exercised peremptory challenges on the basis of race, and the trial court erred by not requiring the prosecutor to explain his strikes.  (Petr's Dir. Appeal Br. 28).  Citing the discussion in the trial record about Mr. Brooks and Ms. Torres, Petitioner claimed that defense counsel specifically objected to the use of peremptory challenges which "resulted in the first 8 jurors selected being of the white race."  (Id.).  Unaware that Batson had been decided the year before,

44

Petitioner noted that "a case of this nature is on certiorari in the United States Supreme Court." (Id.)  By "objecting and noting the manner and use of peremptories by the prosecutor," defense counsel believed he had adequately preserved Petitioner's rights.  (Id. at 28-29).  Petitioner did not request an evidentiary hearing at this time.[24]  The Pennsylvania Supreme Court, quoting extensively from Judge Geisz's opinion, concluded that Petitioner's Batson claim was "utterly devoid of any specifics whatsoever . . . to prove the allegation."  Lambert-1, 603 A.2d at 577.

  In his first PCRA petition, Petitioner revived his Batson argument in the form of an ineffective assistance of counsel claim.[25]  Petitioner contended that prior counsel inadequately briefed and developed the Batson issue on direct appeal.  In Petitioner's view, trial counsel had in fact established a prima facie case of discrimination because: (1) the first eight jurors selected were white; (2) the prosecutor only questioned black jurors about economic hardships; (3) two jurors in particular were excused because of their race; and (4) defense counsel mentioned during voir dire that the discriminatory exercise of peremptory challenges was a "noted characteristic" of the Philadelphia District Attorney's office.  (Petr's Supplemental Pet. under the PCRA 16-17).  Thus, Petitioner contended, the trial court should have required the prosecutor to provide race-neutral reasons for his peremptory challenges, and counsel was ineffective for not raising these

---

[24] Petitioner claims he effectively requested an evidentiary hearing by noting in his direct appeal brief that "[p]resently a case of this nature is on certiorari in the United States Supreme Court."  (Petr's Dir. Appeal Br. 28).  We will not construe this vague reference to Batson as a request for an evidentiary hearing on the peremptory strikes issue.

[25] Petitioner argues that he also raised (and Judge Poserina considered) a substantive claim of error under Batson.  The record indicates otherwise.  Lambert's Supplemental PCRA Petition clearly focused on trial and appellate counsel's ineffectiveness.  In his opinion, Judge Poserina noted that the Batson claim was previously litigated (Poserina, slip op. at 4), and framed the issue on collateral review as one of ineffectiveness.  (Id. at 28) ("Defendant now claims that appellate counsel raised a Batson claim in an ineffective manner.").

arguments on direct appeal.

Additionally, Petitioner claimed prior counsel was ineffective for failing to bring a claim under Swain v. Alabama, 380 U.S. 202 (1965), in light of his personal knowledge of the discriminatory practices of the Philadelphia D.A.'s office.  Petitioner also argued relief under Swain was warranted considering the recent public release of a 1987 training video (the "McMahon tape") in which Assistant District Attorney, Jack McMahon, encouraged prosecutors to exercise peremptory strikes on the basis of race.

Judge Poserina rejected Petitioner's claims without an evidentiary hearing, finding that Petitioner had still "fail[ed] to make a sufficient offer of proof of a Batson violation."  (Poserina, slip op. at 28).  Specifically, Lambert did not "identify the race of the members of the jury, the race of the venire persons who were removed from the venire by the Commonwealth, or the race of the jurors acceptable to the Commonwealth who were stricken by the defense," as required under Commonwealth v. Spence, 627 A.2d 1176, 1182 (Pa. 1993).  (Poserina, slip op. at 28).  Accordingly, there was no factual basis for Petitioner's claim, and appellate counsel was not ineffective.  Likewise, Judge Poserina concluded there was no record support for a Swain violation.

On PCRA appeal, Petitioner contended that Judge Poserina erred by refusing to grant an evidentiary hearing on his Batson/Swain claims, and defense counsel ineffectively raised these issues on direct appeal.  Petitioner pointed to additional evidence in support of these claims, including: (1) trial counsel's notes, purportedly reflecting that the prosecutor exercised 18 of 19 peremptory challenges against black jurors; and (2) a statistical study conducted by Professors David Baldus and George Woodworth (the "Baldus study") on racial disparities in the

46

Philadelphia criminal justice system.  See David Baldus, George Woodworth et al., Racial Discrimination and the Death Penalty in the Post-Furman Era: An Empirical and Legal Overview, With Recent Findings from Philadelphia, 83 Cornell L. Rev. 1638 (1998).  Petitioner also filed a Motion for Remand to the PCRA Court on the Basis of Newly Discovered Evidence, e.g., the Baldus study and McMahon tape.  The Supreme Court denied the motion for remand, and the two-justice OAJ found that the Batson/Swain claims were previously litigated and could not be re-litigated simply because Petitioner now alleged ineffective assistance of counsel. Lambert-2, 797 A.2d at 239-40 & n.4.

Petitioner exhausted his Batson claim in state court by raising it on direct appeal (Lambert-1).  Because the Pennsylvania Supreme Court rejected the claim on its merits, this Court must review it under §2254(d).  In his PCRA petition, Petitioner raised a Swain claim and an ineffective assistance of counsel claim, based on prior counsel's inadequate development of the Batson issue, and failure to bring a potentially meritorious Swain claim.  Judge Poserina rejected these claims on the merits, and we review his decision under AEDPA.

In sum, this Court will review, subject to § 2254(d) deference: (1) the Lambert-1 court's rejection of the Batson claim; (2) the PCRA court's rejection of the Swain claim; and (3) the PCRA court's rejection of the ineffective assistance of counsel claims.  Additionally, we will consider whether Petitioner is entitled to a federal evidentiary hearing under § 2254(e) to further develop the facts underlying his Batson and Swain claims.

### 1.    *Lambert-1* Court's Rejection of the *Batson* Claim

#### a.    State Court's Failure to Conduct a Hearing

Petitioner argues that the Pennsylvania Supreme Court's decision in Lambert-1 was

"contrary to" Batson because the court rejected his claim without remanding the case for a

hearing.  In support, Petitioner relies on the final sentences in the Batson opinion:

> In this case, petitioner made a timely objection to the prosecutor's
> removal of all black persons on the venire.  Because the trial court
> flatly rejected the objection without requiring the prosecutor to
> give an explanation for his action, we remand this case for further
> proceedings.

Batson, 476 U.S. at 100.

In Batson, the Supreme Court repudiated "the evidentiary burden that it had previously

placed on defendants in making an equal protection" challenge to a prosecutor's use of

peremptory strikes.  Holloway v. Horn, 355 F.3d 707, 720 (3d Cir. 2004).  Rejecting

Swain's rigorous requirement that defendants establish discrimination "in case after case," the

Court enunciated a three-part, burden-shifting process for trial courts to follow in evaluating such

claims:

> First, a defendant must make a prima facie showing that a
> peremptory challenge has been exercised on the basis of race.
> Second, if that showing has been made, the prosecution must offer
> a race-neutral basis for striking the juror in question.  Third, in
> light of the parties' submissions, the trial court must determine
> whether the defendant has shown purposeful discrimination.

Miller El v. Cockrell, 537 U.S. 322, 328-29 (2003) (internal citations omitted).

After setting forth the new standard, the Court remanded Batson's case for the trial court

to determine whether a prima facie case of intentional discrimination existed, and if so, whether

the prosecutor could provide race neutral explanations for his strikes.  Batson, 476 U.S. at 100.

Contrary to Petitioner's assertions, the Batson Court did not hold that an evidentiary hearing is

required in all cases where defense counsel objects to the race-based use of peremptory

challenges during voir dire.  Rather, all Batson demanded was that courts remand cases for

48

"further proceedings" so that trial courts could properly apply the new framework set forth by the Court.  Id.

In this case, it is important to note that the Pennsylvania Supreme Court did not affirm the trial judge's pre-Batson conclusion that "peremptories do not have to be explained" without requiring a further hearing on the issue.  Clearly, this would have been contrary to Batson. Rather, the trial judge had the opportunity to consider Petitioner's claim after Batson was decided as part of Lambert's post-trial motions.  Upon reviewing the record, Judge Geisz concluded that the claim was completely speculative as the record did not even indicate the race of the venire persons.  Although Judge Geisz did not use the specific term "prima facie case," he essentially concluded that no inference of discrimination could be gleaned from the record (step one of the Batson analysis).

On direct appeal, Petitioner did not present the court with any additional evidence of discrimination, and the Pennsylvania Supreme Court affirmed the trial court's conclusion that the Batson allegation lacked factual support.  The court's decision to affirm without remanding for a hearing was not contrary to Batson.  As previously noted, Batson only required that state courts perform its three-part, burden-shifting analysis - not that they construct Petitioner's claim for him by conducting an evidentiary hearing that he never even requested.  Cf. Lewis v. Horn, No. 00-CV-802, 2006 WL 2338409, at *13 (E.D. Pa. Aug. 9, 2006) (upholding the state supreme court's denial of Petitioner's request for an evidentiary hearing, reasoning that "[a]bsent any indication from the trial court record that Petitioner could make a prima facie Batson claim, it was not unreasonable . . . to conclude that such a hearing was unnecessary").  Both the trial and state Supreme Court found that the record did not support an inference of discrimination (i.e., there

was no prima facie case) and stopped the analysis at that point.  This was all <u>Batson</u> required, and we will not fault the state courts for failing to conduct an unrequested hearing to further develop Petitioner's claim.

### b.      State Court's Finding of No Prima Facie Case under *Batson*

Petitioner also argues that he established a prima facie case of discrimination on direct appeal, and the <u>Lambert-1</u> decision was both contrary to and an unreasonable application of <u>Batson</u>.  In <u>United States v. Clemons</u>, 843 F.2d 741 (3d Cir. 1988), the Third Circuit set forth an illustrative list of factors for courts to consider "[w]hen assessing the existence of a prima facie case."  <u>Id.</u> at 748.  These include:

> (1)    How many members of the "cognizable racial group" are in the venire;
> (2)    The nature of the crime;
> (3)    The race of the defendant and the victim;
> (4)    Whether there was a pattern of strikes against jurors of a particular race in the venire; and
> (5)    The prosecutor's questions and statements during voir dire.

<u>Id.</u>

On direct appeal, the only evidence before the court in support of Petitioner's <u>Batson</u> claim was the voir dire transcript.  There was absolutely no indication of the racial composition of the entire venire (the first factor), and to this date, there is still no such evidence.  With regard to factors (2) and (3), we think there is no reason to believe the crime was racially motivated.  Petitioner, who is a black male, was convicted of killing two black males, during the course of a robbery.  Regarding the fourth factor, the record on direct appeal contained no indication of a pattern of strikes against black members of the venire.  The record merely demonstrated that defense counsel objected to two of the prosecutor's strikes, one of which was against a person of an unidentified race (Ms. Torres).  Although Petitioner argued that the first eight members of the

50

jury were white, the only support he provided for this assertion was the prosecutor's obviously sarcastic retort during voir dire that he did not realize the first eight jurors were white.  Defense counsel's voir dire notes, purportedly showing a pattern of strikes against black venire persons, were never even presented to the <u>Lambert-1</u> court.[26]  Thus, a pattern of strikes was not demonstrated, and the fourth factor weighs against finding a prima facie case.

The fifth and final factor - prosecutor's questions and statements during voir dire - also militates against finding a prima facie case.  Petitioner alleges that the prosecutor only questioned black venire persons about the economic hardships of jury service.  The only support provided for this assertion is defense counsel's statement during voir dire, that he would no longer directly question potential jurors about hardship, even though the prosecutor had asked several black venire persons about it.  Again, Petitioner has failed to cite any specific evidence in the record to support this assertion.  In fact, Mr. Brooks, the only juror whose race was mentioned in the record, was not even questioned by the prosecutor about the hardships of jury service.  (N.T. Apr. 4, 1984 at 7-8).

Applying the factors articulated by the Third Circuit in <u>Clemons</u> to the evidence presented by Petitioner in <u>Lambert-1</u>, the Court finds that the state court's rejection of the <u>Batson</u> claim was not contrary to or an unreasonable application of <u>Batson</u>.[27]  A review of cases finding a

_____

[26]These voir dire notes were first presented to the Pennsylvania Supreme Court as part of the appeal from denial of Lambert's first PCRA petition, and are discussed infra pp. 57-60 as part of Petitioner's claim that prior counsel was ineffective.

[27] Petitioner contends that the <u>Lambert-1</u> court did not conduct a sufficiently thorough analysis of his <u>Batson</u> claim.  However, in <u>Bronshtein v. Horn</u>, 404 F.3d 700 (3d Cir. 2005), the Third Circuit found that under the "contrary to" clause of § 2254(d), "it is the state supreme court's 'decision,' not its reasoning that must be 'contrary to' clearly established Supreme Court precedent."  <u>Id.</u> at 724; <u>see also</u> <u>Porter v. Horn</u>, 276 F.Supp.2d 278, 334 (E.D. Pa. 2003) (finding

prima facie case of discrimination under Batson further confirms this conclusion.  In most cases, the petitioners identified either a pattern of strikes or a series of statements and questions by the prosecutor that supported an inference of discrimination.  In this case, Petitioner identified neither during the relevant state court proceedings.  See, e.g., Miller-El v. Dretke, 545 U.S. 231 (2005) (prosecutor struck ten of eleven eligible black venire members and posed "contrasting voir dire questions" to black and non-black members of the venire panel); Wilson v. Beard, 426 F.3d 653 (3d Cir. 2005) (parties stipulated that McMahon used at least 8 of 16 peremptory challenges against blacks, and the jury consisted of 9 whites and two blacks); Brinson v. Vaughn, 398 F.3d 225 (3d Cir. 2005) (prima facie case established where record showed that the prosecutor used 13 of 14 peremptories against black venire persons); Hardcastle v. Horn, 368 F.3d 246 (3d Cir. 2004); (state supreme court's concession that petitioner established a prima facie case was "appropriate" where the prosecutor exercised 12 of 14 peremptory strikes against black members of the venire); Holloway v. Horn, 355 F.3d 708 (3d Cir. 2004) (finding a prima facie case based on prosecutor's use of 11 of 12 peremptory strikes against black venire persons; the fact that the defendant was black but the officer who took the defendant's contested statement was white; and the prosecutor's inadequate explanation that he had not exclusively perempted black persons from the jury); Riley v. Taylor, 277 F.3d 261 (3d Cir. 2001) (en banc) (hearing

---

that although the state supreme court applied too exacting a standard in deciding whether Petitioner established a prima facie case, the court's decision that Petitioner failed to prove a prima facie case was nonetheless reasonable); Chadwick v. Janecka, 302 F.3d 107, 116 (3d Cir. 2002) ("While it is necessary for the state court to have adjudicated the claim on the merits, it is not necessary for the state court to have thoroughly explained its analysis in its opinion.") Although the Pennsylvania Supreme Court did not discuss the principles of Batson to the extent the Third Circuit has indicated it would prefer, its conclusion that Petitioner is not entitled to relief is neither contrary to nor an unreasonable application of Batson.

judge found, and state did not contest, the existence of a prima facie case where prosecutor used

all three peremptory challenges against black members of the venire, resulting in an all white

jury); Lark v. Beard, No. Civ.A. 01-1252, 2006 WL 1489977, at *8 (E.D. Pa. May 23, 2006)

(prima facie case is pled where petitioner alleges that at least 10 of the 15 venirepersons excused

by the prosecution were black, and the prosecutor "tacitly admitted that he was excluding

African Americans from the jury by responding 'how awful' to trial counsel's objections").[28]

_____

[28] In his habeas petition, Petitioner further alleges that a prima facie case is established based on: (1) defense counsel's notes purportedly showing that the prosecutor used 18 of 19 peremptories against black jurors; (2) a 2001 study conducted by Professor Baldus; and (3) the McMahon tape.  This Court will not consider the notes in assessing the reasonableness of the state court's decision because this evidence was not timely presented to the state courts. See, e.g., Holloway, 355 F.3d at 723 n.11 ("[B]ecause Holloway failed to develop [the fact that the prosecutor struck 11 of the 14 black members of the venire] in state court, we do not consider it here.").  Petitioner concedes that Mr. Irwin, his trial counsel, did not present his voir dire notes in state court until the first PCRA appeal (Lambert-2).  However, even if we were to consider the notes, we have serious doubts as to what the notes actually reflect about the voir dire at Lambert's trial.  See infra pp. 57-60.

Regarding the Baldus study, the Court's review of the record reveals that Petitioner presented no statistical evidence to the PCRA court.  While Petitioner's PCRA appeal was pending with the Pennsylvania Supreme Court, Petitioner filed a Motion to Remand to the PCRA court in light of David Baldus' 1998 study on charging and sentencing practices in Philadelphia County.  The Pennsylvania Supreme Court denied the Motion to Remand on December 20, 1999.  Petitioner also referenced the Baldus study in his PCRA appeal brief.  The Pennsylvania Supreme Court's decision to deny the Motion to Remand was neither contrary to nor an unreasonable application of Batson or Swain.  The 1998 study focused primarily on the discriminatory administration of the death penalty, and dealt only peripherally with the issue of peremptory strikes.  In fact, the study itself noted that the results of the research on peremptory challenges were "not sufficiently developed to report at this time."  David Baldus, George Woodworth et al., Racial Discrimination and the Death Penalty in the Post-Furman Era: An Empirical and Legal Overview, With Recent Findings from Philadelphia, 83 Cornell L. Rev. 1638 n.85 (1998).

Presently, Petitioner relies on a 2001 study by Professor Baldus which specifically addresses the use of peremptory challenges in capital murder trials in Philadelphia.  See David Baldus, George Woodworth et al., The Use of Peremptory Challenges in Capital Murder Trials: A Legal and Empirical Analysis, 3 U. Pa. J. Const. Law 3 (2001).  Petitioner urges the Court to consider this study in support of his Batson/Swain claim because "[t]he statistical evidence provides additional support for Petitioner's [already-exhausted] Batson claim, but does not

### 2.      PCRA Court's Rejection of the *Swain* Claim

On PCRA review, Petitioner raised a Swain claim based upon: (1) defense counsel's comment during voir dire that race-based jury selection was a "noted characteristic" of the Philadelphia DA's office; and (2) the McMahon tape.  Judge Poserina rejected the claim, finding that Petitioner "ha[d] not and, indeed, cannot make the required showing" for a Swain violation.  (Poserina, slip op. at 28).  Judge Poserina's decision was neither contrary to nor an unreasonable application of clearly established federal law.

The evidence presented to the PCRA court did not establish that the Philadelphia DA's office "repeatedly engaged in purposeful and systematic striking of African-Americans regardless of trial-related considerations."  Porter v. Horn, 276 F.Supp.2d 278, 337 n.42 (E.D. Pa. 2003)  Defense counsel's comment during voir dire was an isolated statement that reflected Irwin's personal opinion, and completely lacked record support.  In the absence of additional evidence, the McMahon tape, created five years after Petitioner's trial, does not establish "overwhelming and pervasive discrimination" by the Philadelphia DA's office "as required by Swain."  Id.  The weight of authority establishes that in cases tried before the tape was made, by a prosecutor other than McMahon, the tape is of little probative value.  See,e.g., Abu Jamal v. Horn, No. CIV. A. 99-5089, 2001 WL 1609690, at *109 (E.D. Pa. Dec. 18, 2001) ("[T]he [McMahon] tape is irrelevant because its production occurred five years after petitioner's trial and because it relates

---

change [its] fundamental nature."  (Petr's Letter Br., Dec. 17, 2006 at 3 n.1).  Even assuming this to be true, we find that the 2001 Baldus study does not alter this Court's finding that Petitioner has not established a prima facie case.  Petitioner has failed to show any connection between the statistical evidence and the jury selection during Lambert's trial.

Finally, with regard to the McMahon tape, Petitioner raised this issue in the PCRA court in the context of a Swain claim.  We therefore discuss the significance of the tape in the following section.  See Part H.2 (addressing the adjudication of the Swain claim in state court).

to the views of McMahon, not those of McGill [the prosecutor at petitioner's trial]."); <u>Porter v. Horn</u>, 276 F.Supp.2d 278, 337 (E.D. Pa. 2003) (refusing to consider the tape because it was not fairly presented to the state courts, but noting that if the court did consider it, the tape was produced after petitioner's trial and there was no evidence that the prosecutor was aware of it or had adhered to it); <u>Lewis v. Horn</u>, No. 00-CV-802, 2006 WL 2338409, at *13 (E.D. Pa. Aug. 9, 2006) (rejecting the tape as evidence of discrimination at petitioner's trial because the "trial occurred four years prior to the creation of the video and there has been no evidence presented to suggest that the prosecutor in Petitioner's case engaged in those practices").  <u>But see</u> <u>Lark v. Beard</u>, No. Civ.A. 01-1252, 2006 WL 1489977, at *8 n.15 (E.D. Pa. May 23, 2006) (finding that even though McMahon did not prosecute Lark, the McMahon tape "could conceivably reflect a culture of discrimination that is relevant to the determination of Lark's <u>Batson/Swain</u> claim.")

### 3.    Request for a Federal Evidentiary Hearing under § 2254(e)

Petitioner urges this Court to conduct an evidentiary hearing to develop the record with respect to his <u>Batson</u> and <u>Swain</u> claims.  Under § 2254(e), a federal habeas court may grant an evidentiary hearing in limited circumstances:

> If the applicant has failed to develop the factual basis of a claim in State court proceedings, the court shall not hold an evidentiary hearing on the claim unless the applicant shows that the claim relies on a new rule of constitutional law . . . or a factual predicate that could not have been previously discovered through the exercise of due diligence; and the facts underlying the claim would be sufficient to establish by clear and convincing evidence that but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense.

28 U.S.C. § 2254(e)(2).

In <u>Williams v. Taylor</u>, 529 U.S. 420 (2000), the Supreme Court held that the opening

clause of § 2254(e)(2) ("failed to develop") requires "a lack of diligence, or some greater fault, attributable to the prisoner or the prisoner's counsel." Id. at 432. Diligence "depends upon whether the prisoner made a reasonable attempt, in light of the information available at the time, to investigate and pursue claims in state court." Id. at 435. If the Petitioner has not "failed to develop" the state court record as defined in Williams, the district court has discretion to convene an evidentiary hearing. Campbell v. Vaughn, 209 F.3d 280, 286-87 (3d Cir. 2000). In exercising this discretion, the court should "focus on whether a new evidentiary hearing would be meaningful, in that a new hearing would have the potential to advance the petitioner's claim." Id. at 287.

In this case, Petitioner failed to develop his Batson/Swain claims within the meaning of § 2254(e)(2), and therefore is not entitled to an evidentiary hearing. Batson was decided while Petitioner's post-trial motions were pending before Judge Geisz. At that time, nothing prevented defense counsel from developing a more detailed record of the voir dire proceedings or requesting an evidentiary hearing for that purpose. However, Petitioner's counsel did not request a hearing on this issue until the PCRA appeal to the Pennsylvania Supreme Court (Lambert-2).[29] Moreover, defense counsel's notes, which are arguably the most probative evidence relating to

---

[29] Petitioner contends he "necessarily requested an evidentiary hearing from the PCRA court" because he raised an ineffectiveness claim in his first PCRA Petition based on prior counsel's failure to "challenge the trial court's refusal to conduct a hearing." (Petr's Letter Br., Dec. 17, 2006 at 2; Petr's Supplemental Pet. under the PCRA at 16). We will not interpret a reference to an evidentiary hearing, made in the context of an ineffectiveness claim, as a request for a hearing. Rather, we find that Petitioner did not actually request an evidentiary hearing on the Batson claim until his PCRA appeal (Lambert-2). See Petr's Mot. to Remand at 22 (requesting "[t]hat an evidentiary hearing on the claims and any and all disputed issues of fact be granted"); Petr's First PCRA Appeal Br. at 49-50 ("[A]ppellant is entitled to a remand for an evidentiary hearing on the prosecutor's discriminatory use of his peremptory challenges.").

Petitioner's Batson claim, were not presented to the state courts until the PCRA appeal.

Petitioner provides no excuse for this delay.

In Lark v. Beard, the court found that petitioner did not fail to develop his claim in state

court even though he did not request an evidentiary hearing until his second PCRA petition.

Lark, 2006 WL 1489977, at *6-8.  In reaching this conclusion, Judge Padova relied on the Third

Circuit's holding in Wilson v. Beard, 426 F.3d 653 (3d Cir. 2005):

> If a petitioner requests a hearing to develop the record on a claim in
> state court, and if the state courts . . . deny that request on the basis
> of an inadequate state ground, the petitioner has not 'failed to
> develop the factual basis of [the] claim in State court proceedings'
> for purposes of § 2254(e)(2).

Id. at 665.

Petitioner contends that because he requested a hearing in his first PCRA petition, he

exhibited more diligence than Lark, and thus is entitled to a federal hearing.  We are not

persuaded.  The Lark court found that "Lark did not demonstrate a lack of diligence" because

"the state court relied on an inadequate ground for its decision to deny review without an

evidentiary hearing." Lark, 2006 WL 1489977 at *8 n.14 (emphasis added).  The same is not true

in this case.  Lambert first requested a hearing on PCRA appeal, and the OAJ denied relief

without a hearing, finding that the Batson claim was "previously litigated."  Lambert-2, 797 A.2d

at 239-240.  The previous litigation rule is "not a state procedural requirement," Alford, 2006

WL 516768, at *4, and therefore we cannot say that Petitioner was denied a hearing on the basis

of an inadequate procedural ground.

### 4.   Ineffective Assistance of Counsel Claim

Petitioner contends Irwin was ineffective to the extent he failed to present evidence of a

prima facie case that was available to him on direct appeal.  Specifically, Petitioner argues, "appellate counsel's notes alone would [have been] sufficient evidence, in conjunction with his objection at trial, to require the state court to grant relief, or, at a minimum, an evidentiary hearing," yet he failed to provide the notes to the Pennsylvania Supreme Court in Lambert-1. (Petr's Br. 125-126).   This does not amount to constitutional ineffectiveness under Strickland.

At the time of Petitioner's direct appeal, the Supreme Court had held that Batson applied retroactively to cases (such as Petitioner's), which were pending on direct review when Batson was decided.  See supra n. 22.  However, the United States Supreme Court, Third Circuit Court of Appeals, and Pennsylvania Supreme Court had not handed down any definitive rulings interpreting Batson, or explaining for the benefit of the bench or bar how Batson was to be applied, and what procedures were appropriate to develop a record for pursuing a Batson claim. Thus, we cannot say from an objectively reasonable point of view, that Irwin was ineffective in failing to anticipate subsequent case law and proffer the notes to Judge Geisz or the Pennsylvania Supreme Court on direct appeal.

It is understandable for Petitioner to argue, particularly now that he is under a death sentence, that any potentially favorable evidence that was not brought forward during the state court proceedings, should have been presented - but this is not the constitutional test.  If Irwin had presented the notes on direct appeal, he very likely would have had to withdraw as counsel to testify if an evidentiary hearing had been granted, which is itself speculative.  There are fundamental strategic reasons why Irwin, perhaps with Petitioner's consent, may have concluded that continuing as Petitioner's counsel, with his thorough knowledge of the record, was more important than testifying about the Batson issue - particularly at a time when the post-Batson law

58

was undeveloped.  Thus, we conclude that Irwin's conduct was not professionally or objectively unreasonable under Strickland.

Moreover, even if Irwin had presented the notes during post-trial proceedings or on direct appeal, we do not think there is a reasonable probability the court would have found a Batson violation.  The voir dire notes contain the names of each member of the venire along with various unexplained check marks.  Next to twenty of the names, Irwin wrote "D.A." and "B."[30] After one juror's name (Gwendolyn Conway), he wrote what appears to be "D/A," and next to another juror (Iliana Torres), he wrote "D.A." and "S.B."  If we assume the combination of "D.A." and "B" means that prosecutor Myers exercised a peremptory challenge against a black juror, it is clear that Myers struck numerous black persons from the venire.  However, the notes do not indicate the total number of jurors Myers struck, or the racial composition of the entire venire.  See Brinson v. Vaughn, 398 F.3d 225, 235 (3d Cir. 2005) (finding that a stark pattern of strikes is sufficient to establish a prima facie case "in the absence of any circumstance (such as a venire composed almost entirely of African Americans) that might provide an innocent explanation").  Without this additional information, we have no way of knowing what the notes actually reflect about the voir dire at Lambert's trial.  Therefore, Petitioner has also failed to establish that counsel's alleged shortcomings prejudiced him in any legally significant way.

We note that Petitioner's present counsel also failed to produce these notes during the

---

[30] The twenty prospective jurors with "B" and "D.A." next to their names are: (1) David Cooper; (2) Nancy Davis; (3) Annie Dennis; (4) Bryant Miller; (5) Mary Rice; (6) Grace White; (7) Rebecca Johnson; (8) prospective juror No. 0302 (name is illegible); (9) prospective juror no. 0841 (name is illegible); (10) name and number are illegible; (11) James Brooks; (12) Antoinette Modley; (13) Barbara Jordan; (14) Loretta Le Vere; (15) Gloria Gary; (16) Chris Benson; (17) Dawn Marshall; (18) Margaret Marrid; (19) Ruth Riveras; and (20) Lola Davila.

PCRA proceedings before Judge Poserina, and has failed to state any reason for not doing so. Counsel, however, has not alleged his own ineffectiveness, nor would we recognize such a claim under AEDPA.  See § 2254 (I) ("The ineffectiveness or incompetence of counsel during Federal or State collateral post-conviction proceedings shall not be a ground for relief in a proceeding arising under section 2254.").  It is hard to understand how present counsel can allege ineffective assistance of counsel against Mr. Irwin, but give no reason for making the same omission himself.

Finally, to the extent the decision to grant or deny an evidentiary hearing on this issue is discretionary, we would deny the request.  The passage of twenty-three years since the trial of this case would make recollections difficult, invite speculation and throw into doubt a jury selection that appears, overall, to have been fair and without any substantial evidence of racial discrimination.

I.    **Claim 12**

Petitioner contends that defense counsel's "brutish, offensive behavior" and "appalling lack of civility and respect for the proceedings" during the guilt and penalty phases of the trial, deprived him of effective assistance and constituted "constructive abandonment."  (Petr's Br. 132).  Petitioner raised the ineffectiveness portion of this claim in his PCRA petition and Judge Poserina rejected it on the merits.  (Poserina, slip op. at 20-21).  Accordingly, we review Judge Poserina's decision under AEDPA's deferential standard of review, and find that it was not contrary to or an unreasonable application of clearly established federal law.[31]

---

[31] Petitioner did not raise the Cronic "constructive abandonment" argument until his PCRA appeal to the Pennsylvania Supreme Court.  (Petr's First PCRA Appeal Br. 51-54).  The OAJ found the claim was waived because it was not presented to the PCRA court.  Lambert-2,

Petitioner claims Irwin made a number of objectionable statements throughout the trial, focusing the jury's attention "on counsel's contemptible behavior" rather than the case. (Petr's Br. 133). However, as Judge Poserina observed, Irwin made the majority of questionable remarks outside the presence of the jury. Although a few comments were made while the jury was present, none of these remarks were so objectionable that they deprived Petitioner of effective representation of counsel. See N.T. Apr. 13, 1984 at 88 (stating "[w]e are hiding things today" in response to the judge limiting a witness' testimony); N.T. Apr. 16, 1984 at 25 (noting "[t]here's no little bit of electric chair" after the judge remarked that a statement was "a little bit leading"); N.T. Apr. 18, 1984 at 156-57 ("It's time for [Detective Graham] to make up any lie he wants . . . He's lying.  He should be off the stand."); N.T. Apr. 23, 1984 at 65 ("You said I could do it and then you changed your mind because [Meyers and Cannon] started crying to you."). Furthermore, on at least two occasions, Judge Geisz cautioned the jury that they were to disregard certain remarks made by Irwin. See N.T. Apr. 13, 1984 at 88 ("The remark of 'we are hiding things today' will be stricken from the record."); N.T. Apr. 23, 1984 at 66 ("The jury will pay no attention to these occasional editorial comments of defense counsel.").

Although some of Irwin's statements were certainly inappropriate, his conduct by no means "fell below an objective standard of reasonableness" under Strickland.  466 U.S. at 688.

---

797 A.2d at 241 n.6 ("Appellant does not pursue the ineffectiveness version of the claim[] in this appeal, instead preferring the new 'counsel abandonment' theory.").  Because the procedural ground relied on by the Pennsylvania Supreme Court is inadequate to bar habeas review, we review this claim de novo, and conclude that Cronic does not warrant relief.  See supra pp. 19-22 (discussing relaxed waiver doctrine and appropriate standards of review).  Cronic applies only when "counsel entirely fails to subject the prosecution's case to meaningful adversarial testing." Bell v. Cone, 535 U.S. 685, 697 (2002) (emphasis in original).  Even a cursory review of the trial record reveals that is certainly not the case here.

Irwin was a zealous advocate who fought hard for his client throughout the entire trial. He raised appropriate legal objections and made well-reasoned arguments to both the judge and jury. Petitioner's sixth amendment rights were not violated in this case.

### J.    Claim 14

Petitioner claims defense counsel was constitutionally ineffective during his closing argument when he prejudicially informed the jury that he was court-appointed, and that Lambert had been held without bail since his arrest. Such statements, according to Petitioner, "provided the jury with a motive for [Lambert] to have committed the robbery . . . [and] suggested . . . that [he] was a danger to the community." (Petr's Br. 138). Petitioner raised this claim in his first PCRA petition and on collateral appeal to the Pennsylvania Supreme Court. Judge Poserina rejected it on the merits, and the OAJ affirmed. (Poserina, slip op. at 16-18; Lambert-2, 797 A.2d at 247-48). We review the state court decision under AEDPA's deferential standard of review, and conclude it was not an unreasonable application of Strickland.

### 1.    Court-Appointment

During closing arguments, defense counsel told the jury he was court-appointed, and neither Lambert nor his family paid him for his services:

> I think of utmost importance, ladies and gentlemen, is the touchstone of corroboration and of interest. Now, I have an interest because I don't like to lose.
>
> Mr. Myers has an interest, as does Mr. Cannon. But when you evaluate this testimony, I want you to know that I don't know Mr. Reese. I don't know Mr. Lambert. I don't know Mr. Lambert's family and I wasn't paid by his family and I wasn't paid by him. I'm here, as I told you several weeks ago, as a court appointed counsel which means the court appointed me to come here and take this case.

So, if you think that what I'm saying to you is because I'm being
paid to say it, that's not the case.  If you think I'm saying this
because of Mr. Lambert and his family, that's not the case.

. . .

I'm not telling you because he pays me money.

. . .

And I want to ask is it justice that Mr. Jackson sits here and tells
you he gets third degree murder and this man is going to ask you
for the electric chair for Mr. Lambert[,] and I'm not saying this
about the electric chair because I'm paid here, because I had
relatives murdered too, and the electric chair is wrong. . . .

(N.T. Apr. 23, 1984 at 97-98, 114, 131).

Judge Poserina concluded that Irwin had a "reasonable basis" for making these

statements: "[h]e wanted the jury to believe that he took [Lambert's] case, because he believed in

defendant's innocence and not . . . because he was being paid to do so."  (Poserina, slip op. at

17).  We agree that defense counsel's statements were clearly part of a sound trial strategy (i.e.,

to convince the jury he believed Lambert was innocent), and Petitioner has failed to demonstrate

otherwise.  See Thomas v. Varner, 428 F.3d 491, 499 (3d Cir. 2005) ("To overcome the

Strickland presumption that . . . a challenged action might be considered sound trial strategy a

habeas petitioner must show either that: (1) the suggested strategy (even if sound) was not in fact

motivating counsel or, (2) that the action could never be considered part of a sound strategy.").

Defense counsel's conduct fell within the "wide range of reasonable professional assistance," and

Judge Poserina's decision to this effect was a reasonable application of Strickland.  See

Strickland, 466 U.S. at 689.

## 2.   Pre-trial Incarceration

Irwin also informed the jury that Lambert had been incarcerated since his arrest on May 4,

1982:

> [Judge Geisz] will . . . tell you about flight and attempt to conceal your identity.
> You can believe if you wish that because a person ran and because a person may
> have concealed their identity that they were conscious of their guilt.  Many times
> the people are guilty, they do run.  Many times when people are guilty, they do
> hide.  But the point is Mr. Myers told you through his questions of Mr. Jackson
> that when you are locked up for murder and charged with first degree murder, you
> don't get bail, which means you stay in jail.
>
> So, by that question you know that Mr. Lambert has been in jail, no bail, since
> May 4, 1982.  You know I'm court appointed.  And you know that the court
> assigned me to handle this case.  So you know he doesn't have any money.
> Therefore, you can consider, if you wish, would you or anyone, if they know they
> are being charged with a murder, with a possibility of the electric chair, whether
> they are guilty or innocent, might not volunteer to go to jail.  Because it's innocent
> until proven guilty, ladies and gentlemen, in the United States.  But he's been in
> jail for a year just like he's guilty.
>
> Sometimes maybe people should run.  You can't say because someone - if that's
> what you believe happened, used a different name or different address, that
> they're guilty.  Because jail is not a nice place.

 (N.T. Apr. 23, 1984 at 123-24).

Judge Poserina found that these comments, "viewed in the totality of the trial," did not

prejudice Petitioner.  (Poserina, slip op. at 17).  The fact that a jury knows a defendant is in

custody "does not per se impair the presumption of innocence."  (Id. at 160).  Moreover, the trial

judge instructed the jury:

> You must not . . .  be biased against the defendant because of the fact that he has
> been arrested for this offense or because of the indictment filed against him and
> the fact that he's been brought to court to stand trial.  None of these facts is
> evidence of his guilt and you are not permitted to infer or speculate upon any or

64

all of them that he is more likely to be guilty or innocent.

(N.T. Apr. 24, 1984 at 10).  Judge Poserina's decision was a reasonable application of

Strickland.  Petitioner has not proved there is a "reasonable probability" that, but for Irwin's

references to Petitioner's incarceration during his closing argument, "the result of the proceeding

would have been different."  Strickland, 466 U.S. at 694.

Additionally, we agree with the Lambert-2 OAJ that trial counsel had a reasonable basis

for referring to Petitioner's pre-trial incarceration, and therefore his performance was not

deficient under Strickland.  Lambert-2, 797 A.2d at 371-72.  It is clear that counsel referenced

Lambert's bail status in order to rebut the Commonwealth's argument that flight demonstrated

consciousness of guilt.  Petitioner has failed to show that these comments were not part of a

sound trial strategy, or were objectively unreasonable under prevailing  professional norms.

See Kimmelman v. Morrison, 477 U.S. 365, 381 (1986) ("[D]efendant bears the burden of

proving that counsel's representation was unreasonable . . . and that the challenged action was

not sound strategy.").[32]  Appellate counsel was not ineffective for failing to raise this meritless

_____

[32] Petitioner also claims an evidentiary hearing is necessary in order to determine whether
defense counsel had a strategic reason for his actions.  (Petr's Br. 141).  The Court rejects this
request for several reasons.  First, counsel's statements were objectively reasonable: he made
them in an effort to convince the jury that he sincerely believed in his client's innocence.
Evidentiary hearings as to counsel's strategy are not necessary "in cases in which the conduct
challenged is objectively reasonable."  Thomas v. Varner, 428 F.3d 491, 501 n.10 (3d Cir. 2005).
Furthermore, we do not have discretion to grant an evidentiary hearing under § 2254(e) because
Petitioner was not diligent in pursuing this claim.  Although Petitioner claims he requested an
evidentiary hearing in state court, there is no evidence that he requested a hearing on this specific
issue.  Cf. Thomas, 428 F.3d at 498 (concluding Petitioner was entitled to a federal evidentiary
hearing because he requested, but was denied, a hearing in the PCRA court to develop the factual
basis of a specific IAC claim).

claim on direct appeal.

## X.   Analysis of Penalty-Phase Claims

### A.   Claim 13

Petitioner contends defense counsel denied him the right to testify on his own behalf at both the guilt and penalty stages of trial.  Lambert raised the penalty phase portion of this claim in his first PCRA petition, and Judge Poserina rejected it on the merits.  (Poserina, slip op. at 36).  On appeal to the Pennsylvania Supreme Court, the OAJ affirmed, concluding that counsel's advice was "not unreasonable," and Lambert's decision not to testify was "fully informed."  Lambert-2, 797 A.2d at 247.  We review the state court decision under AEDPA's deferential standard of review.

On PCRA appeal, Petitioner claimed for the first time that defense counsel also prevented him from testifying during the guilt phase of trial.  The OAJ found this claim was waived because Petitioner failed to raise it in his PCRA petition.  Id. at 240-241 &  n.6.  In light of the relaxed waiver doctrine, we will consider this portion of Claim 13 de novo.[33]

It is well-established that a criminal defendant has the constitutional right to testify on his own behalf.  Rock v. Arkansas, 483 U.S. 44 (1987).  This right is personal to the defendant and may not be waived by trial counsel.  See United States v. Leggett, 162 F.3d 237, 245 (3d Cir. 1998).  "The duty of providing . . . advice [on whether to testify] and of ensuring that [a

---

[33] In his habeas petition, Petitioner argues that defense counsel interfered with Lambert's constitutional right to testify, and "in addition" to this error, "counsel was ineffective for failing to accurately advise Petitioner of his right to testify."  (Petr's Br. 136).  We agree with the Pennsylvania Supreme Court that Petitioner's entire claim should be interpreted as one of ineffective assistance.  See Lambert-2, 797 A.2d at 247 ("Although not specifically articulated as such, appellant's present claim can only be that trial counsel was ineffective for interfering with [his] right to testify; indeed, the cases cited by appellant all deal with ineffectiveness.").

defendant's] waiver is knowing and intelligent rests with defense counsel." United States v. Pennycooke, 65 F.3d 9, 13 (3d Cir. 1995).

### 1. **Guilt Phase**

_____Petitioner claims he "repeatedly told counsel that he wanted to testify" during the guilt stage in order to rebut Janet Ryan's identification testimony, but counsel "refused" to call him because he feared such testimony would open the door to damaging impeachment evidence. (Petr's Br. 135). Petitioner fails to cite a single page in the record in support of these allegations, nor does he explain what his testimony would have been if he had taken the stand. Under these circumstances, we simply cannot conclude that defense counsel's performance was objectively unreasonable, or that Petitioner suffered any prejudice. Accord Martinez v. Wynder, Civ.A.No. 06-4453, 2007 WL 1725189, at *5 (E.D. Pa. June 12, 2007) ("[I]n order to demonstrate prejudice, a petitioner must put forth more than a 'bald assertion' that he was not allowed to testify, including some specifics as to what his testimony would have been."); Jones v. Kyler, Civ.A.No. 02-9510, 2007 WL 187689 (E.D. Pa. Jan. 22, 2007) (adopting report and recommendation that petitioner was not prejudiced under Strickland because he gave "no indication of what his testimony would have entailed"); United States v. Aikens, 358 F.Supp.2d 433, 436 (E.D. Pa. 2005) ("[I]n order to prevail on trial counsel's alleged refusal to allow a client to testify, the petitioner must do more than just assert that his lawyer refused to allow him to testify.").

_____We further deny Petitioner's request for an evidentiary hearing to develop the factual basis of this claim. Under AEDPA, a district court has discretion to conduct an evidentiary hearing only if Petitioner exercised diligence in pursuing the claim in state court. See Williams

v. Taylor, 529 U.S. 420, 435 (2000) ("Diligence . . . depends upon whether the prisoner made a reasonable attempt, in light of the information available at the time, to investigate and pursue claims in state court. . . .").  In this case, Lambert did not raise this claim until his first PCRA appeal, nearly fifteen years after his trial.  Petitioner has provided no excuse for this delay, and he is therefore not entitled to an evidentiary hearing under § 2254(e).

      **2.**   **Penalty Phase**

      Petitioner also contends Irwin prevented him from testifying at the penalty phase. During an in-chambers conference, defense counsel informed Judge Geisz that Lambert wanted to testify, but counsel had advised against it.  (N.T. Apr. 25, 1984 at 44).  Judge Geisz directly questioned Petitioner:

> **Court:** Mr. Lambert, this is – this is an opportunity for you to speak to the jury. Do you wish to talk to the jury?

> **Lambert:** Do I wish to speak to the jury?

> **Court:** Yes.

> **Lambert:** Yeah.  I'd like to say something to the jury.

(Id. at 45).

      Irwin explained that he objected to Lambert "being allowed to make any statement to the jury" because of his "temper . . . temperament . . . [and] prior criminal record."  (Id. at 46).  The court addressed Lambert again:

> **Court:** You have heard the objections of your lawyer, that he feels that you should not speak.  Do you nevertheless wish to speak to the jury?

> **Lambert:** No.  That's all right.  I'll change my mind.

> **Court:** I understand that to me that you do not wish to make any statement to the jury, is that correct?

**Lambert:** Yes, sir.

(Id. at 47).

Based on this colloquy, the PCRA court concluded that Lambert had "not established that counsel interfered with his freedom to testify or gave specific advice that was so unreasonable as to vitiate his decision not to testify." (Poserina, slip op. at 36). Judge Poserina's decision was not contrary to or an unreasonable application of clearly established federal law. The record is clear that counsel emphatically advised Petitioner not to testify at the sentencing hearing based on a number of legitimate considerations, but did not actually prevent Lambert from taking the stand. Judge Geisz's questions (e.g., "Do you nevertheless wish to speak to the jury") clearly indicate that the final decision remained with Petitioner, who knowingly and voluntarily waived his right to testify. Accordingly, defense counsel's performance was not deficient under Strickland, and the PCRA court's decision to this effect was reasonable.

**B.    Claim 15**

Petitioner alleges that the following language in Judge Geisz's charge misled the jury about the role of appellate review, and thereby diminished the jury's sentencing responsibility in violation of Caldwell v. Mississippi, 472 U.S. 320 (1985):

> A sentence of death shall be subject to automatic review by the Supreme Court of Pennsylvania pursuant to its rules. In addition to its authority to correct errors of trial, the Supreme Court shall either affirm the sentence of death or vacate the sentence of death and remand for the imposition of a life sentence.

(N.T. Apr. 25, 1984 at 41-42). Petitioner also claims trial counsel was ineffective for not objecting to these instructions or raising the issue on direct appeal.

Judge Poserina considered this claim on PCRA review, and concluded that Caldwell did

69

not apply to Petitioner because he did not preserve this claim on direct appeal.  (Poserina, slip

op. at 30).  Even if <u>Caldwell</u> applied, there was no error because the trial court simply "referred

to the appeal process in general as it relate[d] to the law that governed [Lambert's] case," and

"did not minimize the jury's sense of responsibility for its verdict or lead [it] to believe that its

verdict would never be carried out."  (<u>Id.</u> at 32).  Additionally, trial counsel was not ineffective

because <u>Caldwell</u> was not the law at the time of Lambert's trial.  (<u>Id.</u> at 29-30).

On PCRA appeal to the Pennsylvania Supreme Court, the OAJ held that Petitioner

waived the substantive <u>Caldwell</u> claim by not raising it on direct appeal, and his "boilerplate"

allegation of ineffectiveness was "inadequate" to meet his burden under <u>Strickland</u>.  <u>Lambert-2</u>,

797 A.2d at 241 n.5, 245.  Because Judge Poserina considered the <u>Caldwell</u> claim on the merits,

we will review his decision under AEDPA's deferential standard of review.

### 1.   ***Caldwell v. Mississippi***

In <u>Caldwell v. Mississippi</u>, 472 U.S. 320 (1985), the Supreme Court recognized that "it

is constitutionally impermissible to rest a death sentence on a determination made by a sentencer

who has been led to believe that the responsibility for determining the appropriateness of the

defendant's death rests elsewhere."  <u>Id.</u> at 328-29.  During closing arguments, Caldwell's

defense attorney pleaded with the jury to show mercy and "confront . . . the gravity and the

responsibility of calling for another's death."  <u>Id.</u> at 324.  In response, the prosecutor stated:

> Now, they would have you believe that you're going to kill this man and they
> know - they know that your decision is not the final decision.  My God, how
> unfair can you be?  Your job is reviewable.  They know it.

<u>Id.</u> at 325.  Defense counsel objected to this statement, but the trial court determined it was

"proper" for the jury to understand their decision was "reviewable automatically . . . so they will

not be confused."  Id.  The prosecutor continued:

> Throughout their remarks, they attempted to give you the opposite, sparing the truth.  They said "Thou shalt not kill."  If that applies to him, it applies to you, insinuating that your decision is the final decision and that they're gonna take Bobby Caldwell out in front of this Courthouse in moments and string him up and that is terribly, terribly unfair.  For they know, as I know, and as Judge Baker has told you, that the decision you render is automatically reviewable by the Supreme Court.  Automatically, and I think it's unfair and I don't mind telling them so.

Id. at 325-326.

_____The Supreme Court vacated Caldwell's death sentence because the prosecutor's "focused, unambiguous, and strong" remarks urged the jury not to view itself as deciding whether the defendant should live or die.  Id. at 340.  This "view of [the jury's] role in the capital sentencing procedure . . . was fundamentally incompatible with the Eighth Amendment's heightened 'need for reliability in the determination that death is the appropriate punishment in a specific case.'"  Id. at 340 (quoting Woodson v. North Carolina, 428 U.S. 280, 305 (1976)).

_____Subsequently, in Romano v. Oklahoma, 512 U.S. 1 (1994), the Court clarified that Caldwell only applies to "certain types of comment - those that mislead the jury as to its role in the sentencing process in a way that allows the jury to feel less responsible than it should for the sentencing decision."  Id. at 9 (quoting Darden v. Wainwright, 477 U.S. 168, 184 n.15 (1986)).  Thus, in order to establish a Caldwell error, "a defendant necessarily must show that the remarks to the jury improperly described the role assigned to the jury by local law."  Id. (quoting Dugger v. Adams, 489 U.S. 401, 407 (1989)).

_____**2.**   **Application of _Caldwell_ in the Third Circuit**

_____Application of Caldwell in the Third Circuit has been rather limited.  In Zettlemoyer v. Fulcomer, 923 F.2d 284 (3d Cir. 1991), the court considered the following jury charge:

71

Ladies and Gentlemen, you must now decide what sentence is to be imposed upon the defendant, whether it be death or life imprisonment.  In a very proper sense, you are not really making that decision.  You are not deciding whether he should be sentenced to death or life imprisonment. . . . That is not what you are to decide.  You are to decide whether there are certain aggravating circumstances or mitigating circumstances and depending upon how you find those circumstances . . . your decision follows.  It must follow.  If you find a certain way, a certain penalty must follow.  That is the law.

_____. . .

_____So you see, it is not really your decision in a sense.  You decide, of course, the underlying factors but it is the way you decide those factors that the penalty is imposed.  That is the way the Supreme Court and our legislature have felt that they would remove that burden or that discretion from the jury.

923 F.2d at 304.

The court concluded that <u>Caldwell</u> did not apply retroactively to Zettlemoyer, but even if it did apply, there was no constitutional error.  <u>Id.</u> at 306.  The trial court had simply explained the law and "point[ed] out that if the jury made certain findings, then 'a certain penalty must follow.'"  <u>Id.</u>  Rather than minimize the jury's sense of responsibility, the instructions emphasized that the jury's conclusion regarding aggravating and mitigating circumstances would determine the penalty the defendant received.  <u>Id.</u>

_____The Third Circuit next revisited <u>Caldwell</u> in a meaningful way in <u>Riley v. Taylor</u>, 277 F.3d 261 (3d Cir. 2001) (en banc).  During penalty phase closing arguments, the prosecutor stated:

<u>Let me say at the outset that what you do today is automatically reviewed by our Supreme Court and that is why there is an automatic review on the death penalty</u>.  That is why, if you return a decision of death, that is why you will receive and have to fill out a two-page interrogatory that the Court will give you.  This is an interrogatory that specifically sets out the questions that the State request and whether or not you believe it beyond a reasonable doubt and if you want in your determination, if you believe the sentence should be death than [sic] each and every one of you has to sign this.  <u>This goes to the Supreme Court</u>.  That is why it is concise and we believe clear and it should be looked carefully on and answered

appropriately.

Id. at 296.  Reviewing Riley's claim de novo, the Third Circuit concluded there was a Caldwell

violation.  Although the prosecutor's closing remarks were technically accurate statements of

Delaware law, they misled the jury "as to the scope of appellate review" and minimized its role

in the sentencing process.  Id. at 296-98 (emphasis added).  At the time of Riley's sentencing,

the Delaware Supreme Court was authorized to reverse a death sentence only if it was

"arbitrarily or capriciously imposed or recommended. . . ."  Id. at 296.  Riley's jurors very likely

did "not understand . . . [the] substantial deference [an appellate court must afford] a jury's

determination that death is the appropriate sentence."  Id.  Moreover, the trial court did nothing

to correct the error, as it "made no comment whatsoever pertaining to appellate review" in the

sentencing charge.  Id. at 298.  Zettlemoyer was distinguishable because in that case, there was

no suggestion that an appellate court "would have the last word," whereas in Riley, the

prosecutor clearly stated "there is an automatic review" and "[t]his goes to the Supreme Court."

Id. at 297.

      **3.**    **Analysis of Petitioner's Claim**

The PCRA court's decision in this case was neither contrary to nor an unreasonable

application of Supreme Court precedent under § 2254(d).  The Supreme Court has never held

that a trial court's general explanation of the appellate review process during its sentencing

charge violates the Eighth Amendment.  Rather, under clearly established federal law, only

comments that affirmatively mislead the jury as to its sentencing role in a way that diminishes

their sense of responsibility for the sentencing decision violate Caldwell.  See Romano, 512

U.S. at 9.  Judge Geisz's passing reference to automatic review by the Pennsylvania Supreme

73

Court by no means affirmatively misled the jury, or improperly described the role assigned to them by state law.

Riley does not alter this conclusion.  In Riley, the Third Circuit found a Caldwell violation applying a de novo standard of review.  See Riley, 277 F.3d at 278 ("Riley's federal habeas petition was filed before the enactment of [AEDPA], and therefore AEDPA does not govern our standard of review.").  In this case, AEDPA's standard of review governs, and we must defer to the state court's decision unless it is objectively unreasonable.  See Woodford v. Visciotti, 537 U.S. 19, 26 (2002) ("[U]nder § 2254(d)(1), it is not enough to convince a federal habeas court that, in its independent judgment, the state-court decision applied [federal law] incorrectly.").  Regardless of how we would resolve this issue in the first instance, we cannot say that Judge Poserina's conclusion was an "unreasonable" application of Supreme Court precedent.

Additionally, in Riley, the prosecutor made two pointed references to appellate review. 277 F.3d at 298.  In fact, he began his closing argument by saying, "Let me say at the outset that what you do today is automatically reviewed by our Supreme Court."  Id.  Although the Delaware death penalty statute contained more than forty provisions, "the only one the prosecutor chose to emphasize was that providing for automatic review of the jury's sentence." Id. at 297 (emphasis in original).  In this case, Judge Geisz read the entire Pennsylvania death penalty statute to the jury as part of his preliminary instructions, and placed no special emphasis on the appellate review provision.  (N.T. Apr. 25, 1984 at 31-42).

Finally, both the prosecutor and trial court clearly informed the jury that they were responsible for determining Lambert's sentence.  Judge Geisz explained, "[t]he court shall . . .

74

impose upon the defendant <u>the sentence fixed by the jury</u>."  <u>Id.</u> at 41 (emphasis added).

Likewise, during closing arguments, Prosecutor Myers stressed the important and difficult role

the jury played in sentencing petitioner.  <u>See id.</u> at 57 ("It is your obligation as jurors to follow

the law and to do your duty. . . . I told you in the beginning of this case that it was not an easy

duty.  It's a very difficult job."); <u>id.</u> at 58 ("[T]his is a very important and crucial proceeding that

you must now face."); <u>id.</u> at 59 ("You must create an emotional vacuum within yourself to

decide whether or not there were these 3 aggravating circumstances. . . . That is something that

you must face up to as jurors and as citizens of this Commonwealth. . . . I know it's difficult.

There's no question about it.").

 For these reasons, the decision of the PCRA court was not contrary to or an unreasonable

application of Supreme Court precedent.  Furthermore, because there was no <u>Caldwell</u> violation,

defense counsel was not ineffective for failing to object to the trial court's instructions or raise

this issue on direct appeal.  Petitioner is not entitled to relief on these grounds.

**C.**   **Claim 16**

Petitioner contends the penalty phase jury instructions and verdict sheet indicated that

the jury <u>unanimously</u> had to find a mitigating circumstance before they could give effect to it in

their sentencing determination, in violation of his Eighth and Fourteenth Amendment rights

under <u>Mills v. Maryland</u>, 486 U.S. 367 (1988).[34]  Petitioner first raised this claim in his PCRA

petition, both as a substantive claim of error and as a claim of ineffective assistance of trial and

---

 [34] <u>Mills</u> was decided in 1988, while Petitioner's direct appeal was still pending, and
therefore applies retroactively to this case.  <u>See Griffith v. Kentucky</u>, 479 U.S. 314 (1987).

appellate counsel.[35]   Judge Poserina rejected the <u>Mills</u> claim on its merits because the sentencing

instructions mirrored the language in the Pennsylvania death penalty statute, 42 Pa. Const. Stat.

§ 9711(c)(1)(iv).[36]   The charge "did not express a need for unanimity in determining . . .

mitigating circumstances [and] [t]he individual jurors were free to weigh whatever mitigating

circumstances they perceived, whether or not other jurors agreed that those circumstances were

established by the evidence."  (Poserina, slip op. at 6).  "Accordingly, there was no <u>Mills v.</u>

<u>Maryland</u> problem."  (<u>Id.</u>).  Additionally, because Lambert's trial pre-dated <u>Mills</u>, defense

counsel was not ineffective for not raising a <u>Mills</u> objection.  (<u>Id.</u> at 7).

On PCRA appeal, the Pennsylvania Supreme Court refused to consider the substantive

<u>Mills</u> claim, finding that Petitioner had waived it by failing to raise it on direct appeal.  <u>Lambert-</u>

<u>2</u>, 797 A.2d at 241 n.5.  Although the ineffectiveness claim was preserved, the court concluded

that Petitioner's "boilerplate allegations [were] inadequate to meet his burden of demonstrating

ineffectiveness at trial, on appeal, or in the PCRA proceeding below."  <u>Id.</u> at 245.

Respondents assert that the substantive <u>Mills</u> claim is procedurally defaulted, and we

may only consider the related IAC claim.  We disagree and will review the claim of error on its

merits because the procedural bar identified by the Pennsylvania Supreme Court in <u>Lambert-2</u> is

inadequate to bar habeas review.  <u>See</u> <u>Jacobs v. Horn</u>, 395 F.3d 92, 117-118 (3d Cir. 2005)

(discussing relaxed waiver doctrine in relation to procedural default).  Also, as previously noted,

---

[35] Petitioner raised the ineffectiveness claim in his Amended PCRA Petition, and
requested that the court review the underlying claim of error in his first Supplemental Petition.
(Petr's Amended Pet. under the PCRA 3; Petr's Supplemental Pet. under the PCRA 1-2, 3).

[36] Although the PCRA court's discussion of <u>Mills</u> is contained in a section entitled
"Ineffectiveness of Trial Counsel," it is clear that Judge Poserina considered <u>both</u> the substantive
claim of error, <u>and</u> the related allegation of ineffectiveness.

the <u>Lambert-2</u> plurality agreed only upon the appropriate result (i.e., to affirm the PCRA court); therefore, we think it is appropriate to view the OAJ as a summary affirmance of Judge Poserina, who did consider the merits of the <u>Mills</u> claim.  <u>See</u> <u>supra</u> n.13.  Accordingly, the <u>Mills</u> claim is properly before this Court, and we will apply AEDPA's deferential standard of review to the PCRA court's decision.

### 1.    *Mills* **and its Application in the Third Circuit**

           In <u>Mills v. Maryland</u>, 486 U.S. 367 (1988), the Supreme Court vacated the petitioner's death sentence because there was a "substantial probability that reasonable jurors, upon receiving the judge's instructions . . . and in attempting to complete the verdict form . . . well may have thought they were precluded from considering any mitigating evidence unless all 12 jurors agreed on the existence of [the same] circumstance."  486 U.S. at 384.[37]  This possibility violated the constitutional principle set forth in <u>Lockett v. Ohio</u>, 438 U.S. 586 (1978) that a capital sentencing jury may "not be precluded from considering, <u>as a mitigating factor</u>, any aspect of a defendant's character or record and any of the circumstances of the offense that the

_____

       [37] Section II of the <u>Mills</u> verdict form read: "Based upon the evidence we unanimously find that each of the following mitigating circumstances which is marked 'yes' has been proven to exist by a preponderance of the evidence and each mitigating circumstance marked 'no' has not been proven by a preponderance of the evidence."  <u>Id.</u> at 378, 387.  The Court concluded that "[a]lthough it was clear that the jury could not mark 'yes' in any box without unanimity, nothing the judge said dispelled the probable inference that 'no' is the opposite of 'yes,' and therefore the appropriate answer to reflect an inability to answer a question in the affirmative."  <u>Id.</u> at 378.  "No instruction was given indicating what the jury should do if some but not all of the jurors were willing to recognize something . . . as a mitigating factor."  <u>Id.</u> at 379.

       The jury was then instructed to weigh only those mitigating circumstances marked "yes" in Section II, against any unanimously-found aggravating circumstance.  <u>Id.</u> at 380.  The Court concluded that based on these instructions, "[a]ny mitigating circumstance not so marked, <u>even if not unanimously rejected</u>, could not be considered by any juror" at the balancing stage. <u>Id.</u> (emphasis added).  The "possibility that a single juror could block [the] consideration" of all mitigating evidence was one the Court "dare[d] not risk."  <u>Id.</u> at 384.

defendant proffers as a basis for a sentence less than death." Id. at 604 (emphasis in original). The Supreme Court  clarified in Boyde v. California, 494 U.S. 370 (1990), that the proper legal standard for reviewing ambiguous jury instructions  is "whether there is a reasonable likelihood that the jury has applied the challenged instruction in a way that prevents the consideration of constitutionally relevant evidence." Id. at 380.

The Third Circuit has applied Mills on a number of occasions.  In Zettlemoyer v. Fulcomer, 923 F.2d 284 (3d Cir. 1991), the court held that the challenged jury instructions[38] and verdict form did not violate Mills because "[n]either the court nor the verdict sheet stated that the jury must unanimously find the existence of particular mitigating circumstances or that the jury could weigh only those mitigating circumstances which it found unanimously." Id. at 308.

---

[38]The instructions read:

> The verdict, of course, must be unanimous.  Again, if you find unanimously, beyond a reasonable doubt, the aggravating circumstance that I have mentioned, the only one that's applicable . . . that is an aggravating circumstance.  If you find that aggravating circumstance and find no mitigating circumstances or if you find that the aggravating circumstance . . . outweighs any mitigating circumstance you find, your verdict must be the death penalty.  If, on the other hand, you find that the Commonwealth has not proven an aggravating circumstance beyond a reasonable doubt or if they have, that the mitigating circumstances outweight [sic] the aggravating circumstances, then you must bring in a verdict of life imprisonment.
> . . .
>
> Under the law . . . you are obligated . . . to fix the penalty at death if you unanimously agree and find beyond a reasonable doubt that there is an aggravating circumstances [sic] and either no mitigating circumstance or that the aggravating outweighs any mitigating circumstances.

Zettlemoyer, 923 F.2d at 307-08.

The court's language - "unanimously agree and find beyond a reasonable doubt" - indicated only that the "jury's ultimate conclusion must be unanimous, not that each interim step in its deliberations be unanimous." Id.  Additionally, the verdict form required the jury to list the aggravating circumstances it found, but not the mitigating circumstances, "suggesting that consideration of mitigating circumstances was broad and unrestricted." Id.[39]

The Third Circuit next applied Mills in Frey v. Fulcomer, 132 F.3d 916 (3d Cir. 1997), and concluded that the charge was unconstitutionally "ambiguous [and] reasonably likely to confuse the jury." Id. at 924.[40]  The charge read in relevant part:

> The Crimes Code provides that the verdict must be a sentence of death if the jury unanimously finds at least one aggravating circumstance and no mitigating circumstance, or if the jury unanimously finds one or more aggravating circumstances which outweigh any mitigating circumstances.  The verdict must be a sentence of life imprisonment in all other cases.
> . . .
>
> Remember that your verdict must be a sentence of death if you unanimously find

---

[39] Specifically, the verdict form read:
  1. We the jury unanimously sentence the defendant to [x] death __
     life imprisonment.

  2. (To be used [if] the sentence [is] death)
     We the jury have found unanimously:

       __ at least one aggravating circumstance and no mitigating circumstance.
       The aggravating circumstance is _____.

       [x] the aggravating circumstance outweighs [the] mitigating
       circumstances.  The aggravating circumstance is [the
       murdering of a prosecution witness to prevent testimony in
       a felony case.]

923 F.2d at 308.

[40] The Frey court applied pre-AEDPA standards in determining whether there was a Mills violation.

> at least one aggravating circumstances [sic] and no mitigating circumstances, or if you unanimously find one or more aggravating circumstances which outweigh any mitigating circumstances.  In all other cases, your verdict must be a sentence of life imprisonment.

Id. at 922.  The court found that the close proximity of the word "unanimously" to the "mitigating circumstances" clause (seven words) was particularly problematic because it created "one sound bite," making it "quite possible that a juror would, regardless of other qualifying language, believe that mitigating circumstances had to be found unanimously."  Id. at 923.  The burden of proof instructions very likely increased the jury's confusion by distinguishing between the "burdens that attach to aggravating and mitigating circumstances" (i.e., beyond a reasonable doubt and preponderance of the evidence), without explaining that different unanimity requirements also applied.  Id. at 923-24.  Although the Frey verdict slip was "substantially the same" as the one upheld in Zettlemoyer, the jury charges were "significantly different," and Zettlemoyer's discussion of the verdict slip was therefore "not controlling."  Id. at 924.[41]

---

[41] The court distinguished Zettlemoyer on a number of other grounds.  In the Zettlemoyer charge, the word "unanimously" was separated from the "mitigating circumstances" clause by seventeen words and not "one sound bite" as in Frey.  132 F.3d at 923.  Furthermore, the Zettlemoyer instruction contained the language "unanimously agree and find," whereas the Frey charge read "unanimously finds."  Id.  Because the unanimity language only modified the word "find," rather than the term "agree" as it did in Zettlemoyer, the Frey "jury could reasonably have believed that unanimity was required in both its ultimate and interim conclusions. . . ." Id. (emphasis in original).

The Zettlemoyer burden of proof charge was also materially different because the jury was "specifically instructed . . . that aggravating circumstances must be proven 'unanimously beyond a reasonable doubt.'"  Id. at 923-924.  Finally, it was "notable" that in Zettlemoyer the portion of the instruction explaining the conditions under which the death penalty could be imposed was repeated twice, once with the unanimity requirement and the second time without this requirement.  Id. at 922.  The instructions also referred to aggravating circumstances outweighing "any mitigating circumstance you may find."  Id. (emphasis added).

The Third Circuit revisited <u>Mills</u> in <u>Banks v. Horn</u>, 271 F.3d 527 (3d Cir. 2001), and concluded that the Pennsylvania Supreme Court unreasonably applied <u>Mills</u> to the sentencing instructions and verdict slip used at Banks' trial.[42]   Although the Supreme Court later reversed <u>Banks</u> on the grounds that <u>Mills</u> is not retroactively applicable under the principles of <u>Teague v. Lane</u>, 489 U.S. 288 (1989),[43] the substantive discussion of <u>Mills</u> in <u>Banks</u> continues to be "instructive and relevant."  <u>Hackett v. Price</u>, 381 F.3d 281, 294 n.9 (3d Cir. 2004).

The <u>Banks</u> jury charge was "very similar" to the one examined in <u>Frey</u>: the word "unanimously" was separated from the "mitigating circumstances" clause by only seven words, and although the trial court distinguished between the burdens of proof for establishing aggravators and mitigators, "no mention was made of a distinction between a requirement of unanimity for a finding of aggravating circumstances and the requirement for mitigating circumstances. . . ."  <u>Id.</u> at 547-48.  The charge further stated:

> Remember, again, your verdict in each case must be unanimous.  It cannot be reached by a majority vote or by any percentage.  It must be the verdict of each and every one of you.

<u>Id.</u> at 548-49.

With respect to the verdict slip, the court concluded that its structure and form also implied a need for unanimity.  The form consisted of three pages and two numbered statements:

> 1. We the jury unanimously sentence the defendant in the above matter to
>    _X_  Death
>    ____ Life Imprisonment
>
> 2. (To be completed if the Sentence is Death) We the jury have found unanimously

---

[42] The Third Circuit decided <u>Banks</u> post-AEDPA, and therefore applied the deferential standard of review set forth in 28 U.S.C. § 2254(d).

[43] <u>See</u> <u>Beard v. Banks</u>, 542 U.S. 406 (2004).

    \_\_\_  At least one aggravating circumstance and no mitigating circumstances.  The aggravated circumstance(s) (is)(are): [list of potentially applicable aggravators with places to check if found by the jury].

*Or*

  X  One or more aggravating circumstances which outweigh any mitigating circumstance or circumstances.  The aggravating circumstance(s) (is)(are): [list of potentially applicable aggravators with places to check if found by the jury].  The mitigating circumstance(s) (is)(are): [list of potentially applicable mitigators with places to check if found by the jury].

Id. at 550.  The lead-in language - "we the jury have found unanimously" - suggested that everything that followed was to be found unanimously, and what followed was a "reference both to aggravating and to mitigating circumstances. . . ."  Id.  Accordingly, the Third Circuit concluded there was a reasonable likelihood the jurors believed they must unanimously find mitigating circumstances, and the Pennsylvania Supreme Court's conclusion to the contrary was an unreasonable application of Mills.

In Hackett v. Price, 381 F.2d 281 (3d Cir. 2004), the Third Circuit considered instructions that were substantially similar to the Frey and Banks charges, but determined there was no Mills violation because Hackett's jury unanimously found no mitigating circumstances. Id. at 301.  Thus, there was "no room to speculate that perhaps one juror was . . . precluded from considering mitigating evidence [because] if even a single juror thought that there was any mitigating circumstance, then that juror could not join a verdict in which the jury 'found unanimously' that there was 'no mitigating circumstance.'"  Id.

Most recently, in Albrecht v. Horn, 485 F.3d 103 (3d Cir. 2007), the Third Circuit examined instructions "virtually identical" to those in Frey and Banks and concluded they were

constitutionally infirm.  Id. at 117.  The term "unanimously" was used frequently and "in much

too close proximity to the mitigating circumstances clause."  Id. at 118.  Likewise, the verdict

form was materially identical to the one used in Banks, and contained the lead-in language -

"we, the jury have found unanimously" - followed by a reference to both aggravating and

mitigating circumstances.  Id.  The court distinguished Hackett on the grounds that Albrecht's

jury found three mitigating circumstances, and had to balance them against one aggravating

circumstance.  Zettlemoyer was also distinguishable because in that case the word

"unanimously" was separated from the "mitigating circumstances" clause by seventeen words,

and the Zettlemoyer court concluded that the instructions required unanimity "in the ultimate

conclusion, and not in the interim findings."  Id.  Although the Third Circuit's discussion of

Mills in Albrecht may be instructive, it is ultimately dictum, because the court concluded that

Teague prevented the retroactive application of Mills to Albrecht.[44]

### 2.   Lambert's Jury Instructions and Verdict Form

During the penalty phase of Lambert's trial, Judge Geisz gave the following instructions

on mitigating and aggravating circumstances:

> Aggravating circumstances must be proved by the Commonwealth beyond a
> reasonable doubt.  Mitigating circumstances must be proved by the Defendant by
> a preponderance of the evidence.  Preponderance of the evidence is less of a
> margin than by a reasonable doubt.
>
> The verdict must be a sentence for death if the jury unanimously finds at least
> one aggravating circumstances [sic] specified in subsection "d" and no mitigating
> circumstances[,] or if the jury unanimously finds one or more aggravating
> circumstances which outweigh any mitigating circumstances.  The verdict must

---

[44]A thoughtful but honest review of the cases leaves a lingering doubt about whether lay
jurors could appreciate the distinctions noted by the various Third Circuit decisions reviewed
above.  However, they are binding.

be a sentence of life imprisonment in all other cases.
. . .

So, we are asking you first to determine if there are any aggravating
circumstances and then to determine if there are any mitigating circumstances.

(N.T. Apr. 25, 1984 at 33-35).  The court repeated these instructions at the conclusion of the

charge.  (Id. at 70).  The jury was also provided with a three-page verdict form which read:

**We, the jury . . . do hereby find**:

AGGRAVATING CIRCUMSTANCES [list of ten statutory aggravators with places for
the jury to check if found].[45]

MITIGATING CIRCUMSTANCES [list of eight statutory mitigators with places for the
jury to check if found].[46]

**We the jury have found unanimously**:
[   ] at least one aggravating circumstance and no mitigating circumstance.  The
aggravating circumstance(s) (is) (are) _____.

[x] one or more aggravating circumstances which outweigh any mitigating
circumstances.  The aggravating circumstance(s) (is) (are) __6, 7, 10__.

**We the jury unanimously render the following sentencing verdict**:
DEATH   (x)
LIFE IMPRISONMENT ( )

The verdict form was signed by all twelve jurors.

(Petr's Exhibit 12).

After carefully considering the challenged instructions and verdict form, we conclude

_____

[45] The jury checked numbers six (committed killing while in the perpetration of a felony);
seven (knowingly created a grave risk of death to another person in addition to the victim of the
offense); and ten (defendant was convicted of another offense, committed either before or at the
time of the offense at issue, for which a sentence of life imprisonment or death was imposable).

[46] The jury checked number one (defendant has no significant history of prior criminal
convictions).

that the PCRA court's ruling on Petitioner's <u>Mills</u> claim was not unreasonable under § 2254(d).

The Court recognizes that Lambert's charge contained several of the instructional defects

identified by the Third Circuit in <u>Frey</u> and <u>Banks</u>.  For example, the portion of the instruction

explaining the conditions under which the death penalty could be imposed emphasized the

importance of unanimity, using the word "unanimously" in close proximity with the "mitigating

circumstances" clause.  Likewise, the instructions distinguished between the burdens of proof

associated with aggravating and mitigating circumstances, but did not stress that different

unanimity requirements also applied.[47]

     In this case, however, Lambert clearly instructed his attorney not to present

<u>any</u> evidence or argument to the sentencing jury.  Irwin complied, and told the jury they could

"decide the case as they seek to do so."  (N.T. Apr. 25, 1984 at 48).  For this reason, despite

---

[47] The first part of Lambert's verdict form (listing the aggravating and mitigating circumstances with places to check if found) is notably different from the one in <u>Banks</u>.  In <u>Banks</u>, the language - "we the jury have found <u>unanimously</u>" - preceded the list of aggravators and mitigators.  271 F.3d at 549 (emphasis added).  In Lambert's form, the word "unanimously" was omitted, and the language - "we, the jury . . . do hereby find"- preceded the list of aggravating and mitigating circumstances.  (Petr's Exhibit 12).

The second part of Lambert's form is nearly identical to the verdict slip used in <u>Zettlemoyer</u> (i.e., "We the jury have found unanimously . . . one or more aggravating circumstances which outweigh any mitigating circumstances.  The aggravating circumstance(s) (is) (are) ____.").  The <u>Zettlemoyer</u> court interpreted this language as requiring unanimity for aggravating circumstances only.  Although "the jury was obliged to specify the aggravating circumstance it found, it had no such duty with respect to mitigating circumstances, thus suggesting that consideration of mitigating circumstances was broad and unrestricted."  923 F.2d at 308.  The verdict slip used in <u>Frey</u> was "substantially the same" as the one examined in <u>Zettlemoyer</u>.  132 F.3d at 924.  However, because of significant differences between the jury charges, the "discussion in <u>Zettlemoyer</u> regarding the propriety of the verdict slip [was] not controlling," and the court concluded there was a <u>Mills</u> violation.  <u>Id.</u>; <u>see also</u> <u>Laird v. Horn</u>, 159 F.Supp.2d 58, 106 (E.D. Pa. 2001) (concluding that identical verdict slip language, in conjunction with the jury charge, "emphasized a need for unanimity in finding 'no mitigating circumstance.'").

similarities to the <u>Frey</u> and <u>Banks</u> charges, the PCRA court did not violate any "clearly established federal law" in rejecting Petitioner's claim, as neither the Supreme Court nor the Third Circuit has ever held that these instructions (or materially similar ones) violate <u>Mills</u> when a defendant voluntarily elects not to present mitigating evidence during sentencing.  Rather, in each case Petitioner relies on, the defendant introduced <u>some</u> evidence in mitigation during the penalty phase.[48]

Under these circumstances, we cannot, and will not, afford Petitioner the benefit of the <u>Mills</u> rule.  The concern expressed in <u>Mills</u> (i.e., that jurors would think they were precluded from considering mitigating evidence unless all twelve agreed on the existence of the same circumstance) is simply not present when a defendant completely foregoes the opportunity to put on a penalty-phase defense.  We will not allow Lambert to avoid the consequences of his decision not to introduce mitigating evidence, by granting him the protections of a constitutional principle that was clearly designed for (and has been consistently applied in) starkly different factual scenarios.  <u>Accord</u> <u>Wallace v. Price</u>, 265 F.Supp.2d 545, 570-71 (W.D. Pa. 2003) (adopting magistrate's report and recommendation that the <u>Mills</u> error was harmless because petitioner failed to introduce mitigating evidence, making "the trial court's instruction on mitigating circumstances arguably insignificant and likely even irrelevant").[49]

_____

[48]<u>See, e.g.</u>, <u>Mills</u>, 486 U.S. at 370 ("Defense counsel sought to persuade the jury of the presence of certain mitigating circumstances. . . ."); <u>Zettlemoyer</u>, 923 F.2d at 290 ("Zettlemoyer's father testified at the sentencing hearing. . . ."); <u>Frey</u>, 974 F.2d 348, 353 (3d Cir. 1992) (detailing Frey's "sentencing defense"); <u>Banks</u>, 521 A.2d 1, 9 (Pa. 1987) ("[Banks] presented three mitigating circumstances. . . ."); <u>Albrecht</u>, 485 F.3d at 112 ("Albrecht presented the testimony of a psychiatric expert, Dr. Robert Sadoff.").

[49]Our conclusion is particularly appropriate in light of the Supreme Court's recent decision emphasizing the importance of enforcing a defendant's waiver of his right to introduce

Accordingly, we conclude that the PCRA court did not unreasonably apply any "clearly established federal law" under § 2254(d), and Petitioner is not entitled to habeas relief on these grounds.  Prior counsel was not ineffective for failing to object at trial or raise this issue on direct appeal.

**D.    Claim 17**

Claim seventeen asserts that the trial court improperly defined "preponderance of the evidence" during its penalty phase instructions in violation of the due process clause.  (Petr's Br. 155).  Petitioner raised this claim on direct appeal, and the Pennsylvania Supreme Court rejected it on the merits.  Lambert-1, 603 A.2d at 576-77.  In his first PCRA petition, Petitioner argued that trial counsel was ineffective for failing to object to the burden of proof instructions, and appellate counsel raised this claim in an ineffective manner on direct appeal.  The PCRA court rejected the IAC claims as previously litigated, and noted that "an issue may not be relitigated merely because a new or different theory [i.e., ineffective assistance] is asserted."  (Poserina, slip op. 8).[50]  We review the Pennsylvania Supreme Court's decision on direct appeal under

_____

mitigating evidence.  See Schriro v. Landrigan, 127 S.Ct. 1933 (2007).  In Landrigan, the Supreme Court held that the district court did not abuse its discretion in declining to conduct an evidentiary hearing on petitioner's claim that counsel was ineffective under Strickland during sentencing.  Landrigan, like Lambert, instructed defense counsel not to present any mitigating evidence during his sentencing hearing.  Id. at 1941.  The Court rejected Landrigan's claim that his decision was not "informed and knowing," and concluded that he could not establish prejudice under Strickland.  Id. at 1942-43.

_____

[50]  On collateral appeal, the OAJ likewise concluded "a PCRA petitioner cannot obtain post-conviction review of claims that were previously litigated by alleging ineffectiveness of prior counsel. . . ."  Lambert-2, 797 A.2d at 240.  As previously explained (see supra n.16), a "previously litigated" finding is "an affirmance of the underlying state court ruling" - not a procedural default - and "should be treated as such on federal habeas review."  Alford, 2006 WL 516768, at *5.  In this case, the underlying ruling (i.e., the Pennsylvania Supreme Court's decision on direct appeal) only dealt with the substantive claim of error, and not the related

AEDPA's deferential standard of review.

During the penalty phase of Lambert's trial, Judge Geisz instructed the jury that "mitigating circumstance must be proved by the defendant by a preponderance of the evidence. Preponderance of the evidence is less of a margin than by a reasonable doubt." (N.T. Apr. 25, 1984 at 34). At the conclusion of the charge, he again defined a preponderance as "something less than a reasonable doubt would be the margin." (Id. at 70). On direct appeal, the Pennsylvania Supreme Court upheld these instructions because it "fail[ed] to see . . . how the [trial] court's definition could have confused the jury on any common-sense basis." Lambert-1, 603 A.2d at 576. Additionally, the instructions did not prejudice Lambert because he offered no mitigating evidence, and the jury nonetheless found he did not have a significant history of criminal convictions. Id. at 576-77.

Although we agree with Petitioner that the burden of proof instructions were less than complete, the Pennsylvania Supreme Court's conclusion that they did not confuse the jury was not objectively unreasonable under clearly established federal law. Judge Geisz's instructions adequately conveyed the fundamental concept that a defendant must prove mitigating circumstances by a preponderance of the evidence, which is a lower burden of proof than beyond a reasonable doubt. We will not invalidate these instructions under AEDPA's deferential standard of review in the absence of Supreme Court precedent requiring a more

---

allegations of ineffectiveness. This was the result of a line of Pennsylvania cases, later overruled in Commonwealth v. Collins, 888 A.2d 564 (Pa. 2005), "which treated PCRA ineffective assistance claims as mere variants of the substantive claim raised on direct appeal." Alford, 2006 WL 516768, at *5 n.10. Therefore, in deciding Petitioner's IAC claims, we will consider the direct appeal decision under AEDPA's deferential standard of review, to the extent it relates to counsel's alleged ineffectiveness. See Alford, 2006 WL 516768, at *6 (adopting same approach).

specific definition of the preponderance standard.[51]

Trial counsel was not ineffective for failing to object to instructions which did not violate Petitioner's due process rights, nor did appellate counsel raise this claim in an ineffective manner on direct appeal.  See Petr's Dir. Appeal Br. 26-27.  Although appellate counsel did not cite the specific cases Petitioner relies on in his federal habeas petition, counsel made the same basic arguments, i.e., that the preponderance instructions left the jury "standardless to determine whether or not [Lambert] should live or die."  Id. at 26.  Accordingly, Petitioner's ineffectiveness claims are also meritless.

### E. Claim 18

Petitioner claims the trial court's instructions on the (d)(7) aggravating factor, coupled with the prosecutor's erroneous explanations of the aggravator during his closing, rendered the aggravating circumstance unconstitutionally vague and overbroad, in violation of Petitioner's Eighth and Fourteenth Amendment rights.  Judge Geisz read the (d)(7) aggravating factor to the jury at two points during his sentencing charge: "in the commission of the offense, the defendant [must have] knowingly created a grave risk of death to another person in addition to the victim

---

[51] The Supreme Court cases Petitioner cites in no way stand for the proposition that defining preponderance as "something less" than a reasonable doubt violates a criminal defendant's due process rights.  See, e.g., Addington v. Texas, 441 U.S. 418, 433 (1979) (the standard of proof in a civil commitment proceeding must "inform the factfinder that the proof must be greater than the preponderance-of-the-evidence standard applicable to other categories of civil cases"); Hicks v. Oklahoma, 447 U.S. 343 (1980) (trial court's instruction that jury must sentence a defendant to a 40-year term of imprisonment as a habitual offender violated due process when state supreme court later found the habitual offender statute unconstitutional); Lockett v. Ohio, 438 U.S. 586 (1978) (holding Ohio death penalty statute unconstitutional because it required the jury to sentence the defendant to death unless it found one of three statutory mitigating circumstances by a preponderance); Carter v. Kentucky, 450 U.S. 288 (1981) (criminal defendants are constitutionally entitled to an instruction explaining that they are not compelled to testify, and the fact that they do not testify cannot be used as an inference of guilt).

of the offense." (N.T. Apr. 25, 1984 at 37, 67-68). He explained that it was "for the jury to

decide whether anyone else had their life in danger," and noted there was some "evidence for

the jury to consider on that." (Id. at 37, 68).

During his penalty phase summation, prosecutor Myers argued that the "grave risk"

aggravator applied to Lambert because other people were in the bar at the time of the shooting,

specifically Janet Ryan and Richard Deloach:

> Whose face did [Lambert] put the gun in first; Janet Ryan's. What about Richard
> Deloach? . . . Mr. Graves was in the first seat on the end [of the bar], Mr. Huntley
> next to him and Mr. Deloach was down here a few seats behind him. Janet Ryan
> [was] behind the bar and when the shooting took place, the shooter was facing
> this way. He shot Mr. Graves this way. He shot Mr. Huntley this way. Richard
> Deloach was directly behind them as well as the other patrons to the bar as well
> as the other employees of the bar[,] and that's where the grave risk comes into
> play as well as Janet Ryan. You have already found that this defendant did so in
> meditative – in coldblooded fashion.
>
> So I submit to you that under the facts of the case and from the decisions you
> have already made, you have already found that he . . . created that substantial
> risk against not only Mr. Deloach who was seated at the bar and Janet Ryan[,]
> but the other people in the bar as well.
>
> Do you recall . . . Mr. Deloach testified that Mr. Huntley, the second individual
> who was shot, was walking 4 to 6 feet to the right when he was shot. The same
> risk applied to the other people in the bar if they would have gotten up from their
> seat or moved.

(N.T. Apr. 25, 1984 at 53-55).

On direct appeal, Petitioner challenged the trial court's failure to define the term

"knowingly." The Pennsylvania Supreme Court rejected this argument on the merits, reasoning

that the "violent acts themselves enable a jury to find that the actor knowingly created a grave

risk of death to others." Lambert-1, 603 A.2d at 577 (emphasis added). In his first PCRA

petition, Petitioner claimed the prosecutor improperly told the jury that the (d)(7) aggravating

factor applied because Lambert pointed a gun in Janet Ryan's face, and the trial court failed to

clarify that this aggravator is limited to persons placed at risk by the shooting itself, and not the

robbery as a whole.  (Supplemental Pet. under the PCRA 21).  Petitioner further contended that

trial and appellate counsel were ineffective for failing to raise and litigate this issue.  (Id. at 23).

Judge Poserina denied the claim on the merits because there were "several patrons and

employees in the bar that night . . . [and] [t]he shots defendant fired at Mr. Graves and Mr.

Huntley could have hit anyone in the bar."  (Poserina, slip op. at 34).  Although Janet Ryan was

hiding in the bathroom at the time of the shooting, the bullets could have ricocheted off any

number of surfaces, and passed through the bathroom door.  (Id.).  Petitioner raised the same

claim on PCRA appeal, and the OAJ held it was waived for failure to raise it on direct appeal.

Lambert-2, 797 A.2d at 241 n.5.  Because Judge Poserina considered this claim on the merits,

we will review his decision under AEDPA's deferential standard of review.

An aggravating circumstance is constitutionally invalid if "its description is so vague as

to leave the sentencer without sufficient guidance for determining the presence or absence of the

factor."  Espinosa v. Florida, 505 U.S. 1079, 1081 (1992).  In Gregg v. Georgia, 428 U.S. 153

(1976), the Supreme Court considered a due process challenge to a nearly identical aggravating

factor (i.e., "great risk of death to more than one person").  Although "such a phrase might be

susceptible of an overly broad interpretation," the Court upheld the statutory aggravator because

the Georgia Supreme Court had adopted an appropriate limiting construction.  Id. at 202-203

(state supreme court upheld the aggravating circumstance where defendant indiscriminately

fired his gun into a church, but reversed a finding of "great risk" when the defendant "simply

kidnaped the victim in a parking lot").

The Pennsylvania Supreme Court likewise has applied a narrowing construction to the "grave risk" aggravating circumstance.  In Commonwealth v. Paolello, 665 A.2d 439 (Pa. 1995), the court explained that this factor only applies "in those factual situations where a nexus exists connecting the 'other persons' to the zone of danger created by the defendant's actions in killing the victim."  Id. at 457; see also Commonwealth v. Stokes, 615 A.2d 704, 713 (Pa. 1992) (grave risk aggravator "applies to situations where the defendant in the course of killing his particular victim acts in a manner which endangers the lives of others close in proximity to the intended or actual victim").  Applying this limiting construction, the Pennsylvania Supreme Court has upheld the (d)(7) aggravating circumstance where the defendant fired gunshots into a crowded bar, wielded an axe on a crowded bus, or set fire to a home, killing three people and endangering the life of another.  See Paolello, 665 A.2d at 456-457 (collecting cases).  By contrast, the court has held (d)(7) "completely inapplicable" when the defendant killed one of his victims in an empty room.  Stokes, 615 A.2d at 713-714; see also Commonwealth v. Bolden, 753 A.2d 793, 798-99 (Pa. 2000) (invalidating (d)(7) aggravating factor because second victim entered the store after defendant killed his first victim).[52]

Application of the (d)(7) aggravating factor to Petitioner did not violate his due process

---

[52] Petitioner contends that the Pennsylvania Supreme Court "frequently" applies "expanding constructions," or no construction at all, to the (d)(7) aggravating factor.  (Petr's Br. 161-62).  We disagree.  In each case cited by Petitioner, people other than the victim clearly were in the "zone of danger" created by the defendant's actions.  See, e.g., Commonwealth v. Johnson, 668 A.2d 97, 109 (Pa. 1995) (defendants fired shots at a witness who attempted to pursue them as they fled the murder scene); Commonwealth v. Moore, 633 A.2d 1119, 1136 (Pa. 1993) (decedent shot in "close proximity" to three other robbery victims); Commonwealth v. Logan, 549 A.2d 531, 534 (Pa. 1988) (defendant axed to death a stranger on a public bus with five other passengers onboard); Commonwealth v. Griffin, 515 A.2d 865, 866 (Pa. 1986) (victim shot in room that was "quite crowded with students").

rights, as the facts of this case (i.e., firing a gun in a crowded bar) fall squarely within the limiting construction adopted by the Pennsylvania Supreme Court.  Nor did the prosecutor's closing argument encourage the jury to "misapply" (d)(7) to individuals "well outside the 'zone of danger' created by the shooting. . . ."  (Petr's Br. 164).  Myers properly argued to the jury that the aggravating circumstance applied to Lambert because several patrons and employees of the bar were in close proximity to the shootings.  See N.T. Apr. 25, 1984 at 54 ("Richard Deloach was directly behind [the victims] as well as the other patrons to the bar as well as the other employees of the bar and that's where the grave risk comes into play as well as Janet Ryan.").[53]  Trial and appellate counsel were not ineffective for failing to raise and litigate this meritless issue.[54]

### F.   Claim 19

Petitioner asserts that his waivers of the right to present mitigating evidence and to be represented by counsel during the penalty phase were not knowing, intelligent and voluntary, and he was incompetent to waive those rights.  Furthermore, trial counsel was ineffective for not requesting a competency hearing, and Judge Geisz erred by not conducting one sua sponte.

---

[53] Petitioner contends that the prosecutor's references to Janet Ryan were improper because she was hiding in the bathroom at the time of the shooting, and therefore was not in close proximity to the victims.  (Petr's Br. 164).  Even assuming Ms. Ryan was outside the "zone of danger," this does not alter the fact that several other employees and patrons were present during the shootings, and were placed in "grave risk of death" by Lambert's actions.

[54] To the extent Petitioner also challenges the trial court's failure to define the term "knowingly," the Court finds that the Pennsylvania Supreme Court's decision on direct appeal was reasonable under § 2254(d).  The conclusion that "knowingly" is a term of "common understanding that does not need a specific instruction," is neither contrary to nor an unreasonable application of any Supreme Court precedent.  Commonwealth v. McNair, 603 A.2d 1014, 1018 (Pa. 1992).

### 1.    Summary of Lambert's Sentencing Hearing

After the jury returned a guilty verdict, Judge Geisz called an in-chambers conference to discuss the evidence counsel intended to present during sentencing.  (N.T. Apr. 25, 1984 at 8).  Myers, the trial prosecutor, said he intended to pursue three aggravators: (1) the killing was committed during the perpetration of a felony [(d)(6)]; (2) defendant knowingly created a grave risk of death to another person in addition to the victim [(d)(7)]; and (3) defendant had a significant history of violent felony convictions [(d)(9)].  (Id. at 9).  Irwin objected to the applicability of the (d)(7) and (d)(9) aggravating factors.  (Id. at 9-10).  At that point, the parties returned to court, and Judge Geisz read Bruce Reese (Lambert's co-defendant) his appellate rights.  (Id. at 17-20).

The parties then reconvened in Judge Geisz's chambers, and Myers informed the Judge that the Commonwealth would not pursue the "significant history of violent felony convictions" aggravator because the case law was unclear as to what "significant history" meant.  (Id. at 20-21).  Instead, the Commonwealth would argue that the "(d)(10)" aggravating circumstance applied (i.e., that defendant was convicted of another federal or state offense, committed at the time of the offense at issue, for which a sentence of life imprisonment or death was imposable).  (Id. at 21-22).  Myers said he would call no witnesses, but would move to incorporate the trial record to establish the three aggravating circumstances.  (Id. at 23).

Irwin then detailed the mitigating evidence he wanted to introduce: Lambert was in the Coast Guard for thirteen months and was honorably discharged because he had a nervous breakdown; he was also treated in a V.A. hospital in 1981 for a nervous condition as a result of alcohol and drug abuse.  (Id. at 24).  Irwin intended to call Lambert's sister to testify about these

events.  (Id.).  After Irwin objected to the applicability of the (d)(7) aggravating factor and the

constitutionality of the Pennsylvania death penalty statute, court resumed, and Judge Geisz

instructed the jury on aggravating and mitigating circumstances.  (Id. at 31-42).

       Following these preliminary instructions, Myers moved to incorporate all of the

Commonwealth's trial exhibits and testimony, which Judge Geisz admitted.  (Id. 42-43).  The

Commonwealth indicated it had "no other evidence to present" and Irwin requested a sidebar.

(Id. at 43-44).  During an in-chambers conference with Lambert present, Irwin raised three

points: (1) Lambert wanted to testify during the sentencing hearing, but Irwin advised against it;

(2) Lambert told Irwin that he was in the neighborhood of 55th and Pine during the murder, and

there were witnesses that would have testified to this effect, but were not called; and (3)

Lambert did not want his sister or any other witness to testify during the penalty phase, nor did

he want Irwin to make any arguments to the jury.  (Id. at 44-45).  Irwin explained:

> It's [Lambert's] position that he didn't do anything; that Mr. Reese and Mr.
> Cannon set him up and I may have been a party to that conspiracy; that Mr.
> Reese is the person responsible and that he is the one found guilty of first degree
> murder; therefore, if the jury wishes to reach a verdict of death, so be it[,]
> because he has no desire to present evidence or argue to the jury in that regard.
> Because he feels he's innocent, wrongfully accused and therefore he wants no
> evidence or argument given to the jury.

(Id. at 45).  Judge Geisz directly questioned Lambert:

> **Court:** Mr. Lambert, this is - this is an opportunity for you to speak to the jury.
> Do you wish to talk to the jury?

> **Lambert:** Do I wish to speak to the jury?

> **Court:** Yes.

> **Lambert:** Yeah.  I'd like to say something to the jury.

(Id.).  Irwin interrupted, noting that the purpose of the sidebar was for Lambert "to indicate that

he wanted [Irwin] to place no evidence . . . or argument . . . in front of the jury" -  not to discuss

the possibility of Lambert testifying.  (Id. at 46).  Furthermore, Irwin objected to Lambert "being

allowed to make any statement to the jury because of [his] temper, because of his temperament,

because of his prior criminal record. . . ."  (Id.).  Judge Geisz then conducted the following

colloquy with Lambert:

> **Court:** You have heard the objections of your lawyer, that he feels that you
> should not speak.  Do you nevertheless wish to speak to the jury?
>
> **Lambert:** No.  That's all right.  I'll change my mind.
>
> **Court:** I understand that to me that you do not wish to make any statement to the
> jury, is that correct?
>
> **Lambert:** Yes, sir.
>
> **Court:** And you do not wish to call any witnesses?  And do you wish your
> lawyer to make arguments on your behalf to the jury?
>
> **Lambert:** No, I don't.
>
> **Court:** Very well.

(Id. at 47).

Irwin asked Judge Geisz to inform the jury that Lambert was not presenting argument or

evidence because he felt that he was wrongly accused, and that Reese and Cannon had conspired

against him.  (Id. at 47-48).  Myers objected to such an instruction, and after an angry exchange

of words, they returned to court.  (Id. at 48).  In the presence of the jury, Judge Geisz asked

Irwin if he had anything to present.  Irwin responded, "Mr. Lambert says he has nothing to

present to the jury, Your Honor.  They can decide the case as they seek to do so."  (Id.).  Myers

proceeded with his closing argument, during which he reviewed the evidence in support of the

96

(d)(6), (d)(7), and (d)(10) aggravating factors.  (Id. at 49-60).

Following Myers' summation, Irwin requested another sidebar conference, where he asked the Judge to instruct the jury that the (e)(1) mitigating circumstance ("no significant history of prior criminal convictions") applied to Lambert.  (Id. at 60-61).  Judge Geisz denied the request because Irwin had not presented any evidence in support of this mitigating circumstance.  However, he agreed to tell the jury that they were free to consider any of the mitigating circumstances set forth in 42 Pa. Const. Stat. § 9711(e).  (Id. at 62-65).

Court resumed, and Judge Geisz instructed the jury to consider only the aggravating circumstances as to which the Commonwealth had presented some evidence: (d)(6), (d)(7) and (d)(10).  (Id. at 67-68).  With respect to mitigating circumstances, the jury could "still consider them," although none were presented by defense counsel.  (Id. at 68).  After deliberating for thirty-five minutes, the jury returned a sentence of death.  (Id. at 71).

### 2.  Competency Claim

#### a.  Trial Court's Failure to Order a Competency Hearing Sua Sponte

Petitioner contends there was sufficient evidence that Lambert was incompetent to waive his rights during sentencing to warrant the trial court to order a competency evaluation or hearing sua sponte.  Petitioner raised this claim in his first PCRA appeal to the Pennsylvania Supreme Court, and the OAJ concluded it was waived because Petitioner failed to raise it in his PCRA petition.  Lambert-2, 797 A.2d at 241 n.6.  This claim is therefore exhausted, and we will review it de novo because the procedural bar identified by the state supreme court is inadequate to bar federal habeas review under Third Circuit precedent.

In assessing whether there were sufficient indicia of Lambert's incompetency to warrant

a competency evaluation, "we must consider the nature and quality of the facts known to the court. . . ." Jermyn v. Horn, 266 F.3d 257, 292 (3d Cir. 2001).  Relevant factors include "evidence of a defendant's irrational behavior, his demeanor at trial, and any prior medical opinion on competence. . . ." Drope v. Missouri, 420 U.S. 162, 180 (1975).[55]

In Pate v. Robinson, 383 U.S. 375 (1966), the Supreme Court held that the trial court should have ordered a competency hearing based on the "uncontradicted testimony of four witnesses [recounting] a long history of [defendant's] disturbed behavior," including two suicide attempts and the murder of his 18 month-old son. Id. at 378-380.  Similarly, in Drope v. Missouri, 420 U.S. 162 (1975), the Court determined there were "sufficient indicia of [petitioner's] incompetence . . . to require further inquiry" where the defendant attempted suicide mid-trial, his wife testified about his history of "strange behavior" and his attempt to kill her, and a psychiatric report indicated he would have difficulty assisting his defense. Id. at 162, 175.

Relying on Robinson and Drope, the Third Circuit held in Jermyn v. Horn, that defendant's behavior "was not sufficiently indicative" of incompetence to warrant a competency evaluation or hearing. Jermyn, 266 F.3d at 298.  Jermyn, a paranoid schizophrenic, had attempted suicide several years earlier, refused to take his diabetes medication while in pre-trial custody, composed "odd" poetry and made several strange statements (e.g., "[The police] could

_____

[55] Although Drope dealt with a defendant's competence to stand trial, the Court's analysis is relevant to our inquiry because "the competency standard for waiving counsel and for standing trial is the same." Jermyn, 266 F.3d at 289 (emphasis in original) (citing Godinez v. Moran, 509 U.S. 389, 400 (1993)).  We will assume the same competency standard applies to a capital defendant's waiver of the right to present mitigating evidence, although the Supreme Court has never so held.

arrest him if they felt 'froggy.'").  This behavior, "while strange," did not indicate that defendant was incapable of understanding the nature of the proceedings or assisting his defense.  Id. Moreover, "no medical opinions on competency [were] submitted to the trial court," and defense counsel expressed no concerns regarding Jermyn's competency at any point during the trial.  Id.

_____In this case, Petitioner claims the following facts should have alerted the trial court to Lambert's incompetency: (1) Irwin's proffer that Lambert suffered from a chronic nervous condition, as well as a drug and alcohol addiction; and (2) Petitioner's "confused, rash, volatile and paranoid" behavior during the waiver colloquy, specifically his belief that defense counsel was part of a conspiracy, and his indecision over whether to testify on his own behalf.  (Petr's Br. 169).

The evidence Petitioner relies on is insufficient to cast doubt on Petitioner's competency during sentencing.  Irwin's proffer of the mitigating evidence he intended to present to the jury relating to Lambert's nervous condition and substance abuse "consists merely of allegations" and is not evidence at all.  (Respondents' Br. 174).  Cf. Robinson, 383 U.S. at 378 (four witnesses testified about defendant's "long history of disturbed behavior"); Drope, 420 U.S. at 178 (defendant's wife testified about his behavior and an examining psychiatrist submitted a report).  Furthermore, during his colloquy with Judge Geisz, Lambert merely seemed angry and frustrated that the jury had convicted him of first-degree murder - not "confused, rash, volatile and paranoid" as Petitioner now contends.  (Petr's Br. 169).  In contrast to the truly bizarre and disturbing behavior at issue in Robinson and Drope, Lambert's indecision about whether to testify, and his belief that he was set up, do not indicate that he was "incapable of understanding

the nature of the proceedings, communicating with counsel or assisting in his defense. . . ."

Jermyn, 266 F.3d at 298.

_____   **b.   Defense Counsel's Ineffectiveness in Failing to Seek a Competency Hearing**

Petitioner also contends that defense counsel was ineffective for failing to request a

mental health evaluation or competency hearing, despite "readily apparent" evidence of

Lambert's incompetency.  (Petr's Br. 169-70).  Petitioner first raised this claim on PCRA

appeal.[56]  However, the OAJ did not specifically address the merits of the claim, and therefore

"pre-AEDPA review is appropriate."  Jermyn, 266 F.3d at 300.

We conclude that defense counsel's failure to request a competency hearing did <u>not</u>

constitute deficient performance under <u>Strickland</u>.  As reviewed above, the "facts [Irwin] knew

that would bear on the issue of . . . competency," would not have given "reasonable counsel

'reason to doubt' [Lambert']s ability to understand the proceedings, communicate with counsel,

and assist in his own defense."  <u>Id.</u>  Moreover, Petitioner has failed to cite,[57] and we have not

found, any case where defense counsel was held constitutionally ineffective for failing to request

a hearing to determine if defendant was competent to waive the right to present mitigating

evidence.  <u>Cf. Wood v. Quarterman</u>, No. 05-70042, 2007 WL 1819214, at *7 (5th Cir. June 26,

_____

[56] Petitioner contends he raised the ineffectiveness argument as part of Claim 19 in his PCRA appeal brief.  Claim 19 asserted that Lambert was incompetent to waive his rights during sentencing, and the trial court should have conducted a competency hearing.  (Petr's PCRA Appeal Br. 89).  Petitioner also asserted that "[p]rior counsel was ineffective for failing to raise and litigate these issues."  (<u>Id.</u> at 89-90).

[57] The cases Petitioner cites address a defendant's competence to stand trial or plead guilty - not to waive the presentation of mitigating evidence.  (Petr's Br. 170 nn.24-25).

2007) ("[C]ounsel did not perform deficiently by failing to request a competency evaluation" to determine whether defendant was competent to instruct counsel not to present mitigating evidence, where trial court expressly determined he was competent to stand trial, and defendant presented no evidence that would call his competence into question). In the absence of any controlling authority on point, we decline to make such a ruling on the facts of this case.

            **c.**   **Whether Petitioner's Waivers were Knowing, Intelligent and Voluntary**

            **I.**   **Right to Present Mitigating Evidence**

Petitioner next asserts that his waiver of the right to present mitigating evidence was not knowing, intelligent and voluntary. Petitioner raised this claim in his first PCRA petition, and on PCRA appeal to the Pennsylvania Supreme Court. Judge Poserina rejected it on the merits, finding the assertion that Lambert "did not understand what he was doing when he chose not to present any evidence or argument at the Penalty Hearing [was] wholly unsubstantiated." (Poserina, slip op. at 9). Additionally, because Lambert "directed trial counsel not to prove or argue mitigating factors, [Irwin could] not be deemed ineffective because he did not defy [Petitioner's] instruction[s]." (Id.). On PCRA appeal, the OAJ held that Petitioner had waived this claim by not raising it on direct appeal. Lambert-2, 797 A.2d at 241 n.5. We will review Judge Poserina's opinion under AEDPA's deferential standard of review.

Petitioner contends that the waiver colloquy, which consisted of a few "superficial" questions followed by "monosyllabic responses," was constitutionally defective. (Petr's Br. 174). Judge Geisz failed to ask if Lambert understood the purpose of the sentencing hearing. Likewise, he did not explain the critical role of mitigating evidence and argument, nor did he ask if Irwin had informed Lambert of existing mitigating evidence. In fact, Petitioner argues,

his waiver could not have been knowing and intelligent because Irwin never told Lambert about the mitigating evidence he had gathered.

_____ Recently, in Schriro v. Landrigan, 127 S.Ct. 1933 (2007), the Supreme Court observed that it has never "imposed an 'informed and knowing' requirement upon a defendant's decision not to introduce [mitigating] evidence" or "required a specific colloquy to ensure that a defendant knowingly and intelligently refused to present mitigating evidence." Id. at 1942-43. In light of Landrigan, Petitioner's claim fails under AEDPA, which permits a federal court to grant habeas relief only if the state court unreasonably applied "clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1) (emphasis added).[58]  Likewise, defense counsel was not ineffective under Strickland for failing to request a more detailed colloquy, when there is no clearly established federal law requiring one.

### ii.  Right to Counsel

Petitioner further claims that by foregoing the right to present evidence and argument

---

[58] "Even assuming . . . an 'informed and knowing' requirement exist[ed]," the Landrigan Court further concluded that petitioner could not "benefit from it" because: (1) he failed to develop his claim properly in state court; (2) defense counsel carefully explained the importance of mitigating evidence to him; and (3) Landrigan's statement, "I think if you want to give me the death penalty, just bring it right on.  I'm ready for it," indicated that he "clearly understood the consequences" of not presenting mitigating evidence.  Landrigan, 127 S.Ct. at 1942-43.

If we applied an "informed and knowing" requirement in this case, we would similarly conclude that Lambert is not entitled to relief on these grounds.  The record is silent as to whether Irwin ever explained the importance of mitigating evidence to Lambert, or informed Lambert of the specific mitigating evidence he had gathered.  Under these circumstances, we will not assume that Lambert's waiver was uninformed, particularly because it is clear from the record that Irwin and Lambert did discuss certain aspects of the sentencing hearing (e.g., the disadvantages of Lambert testifying, and the possibility of calling his sister as a mitigation witness).  See N.T. Apr. 25, 1984 at 44 (Irwin stating that he "advised" Lambert against taking the witness stand); id. at 44-45 (Irwin explaining that Lambert does not want his sister to testify during the penalty phase).

102

during the penalty phase, he "effectively" waived his right to counsel at sentencing, and this waiver was not knowing, intelligent and voluntary.  Petitioner raised this claim for the first time on PCRA appeal to the Pennsylvania Supreme Court, but the OAJ failed to address it on the merits.  Accordingly, we review it de novo.

As Respondents concede, "a more detailed colloquy" would have been required if Petitioner had attempted to waive his right to counsel.  (Respondents' Br. 179 n.64).  See Faretta v. California, 422 U.S. 806, 835 (1975) (defendant waiving the right to counsel must be "made aware of the dangers and disadvantages of self-representation so that the record will establish that he knows what he is doing and his choice is made with eyes open") (internal quotations omitted).  In this case, however, Petitioner did not actually waive his right to counsel and proceed pro se during the sentencing hearing.  Rather, he "simply directed [Irwin] as to how to represent him" in the penalty phase.  (Respondents' Br. 179 n.64).  In fact, after Lambert purportedly waived his right to counsel, Irwin continued to advocate vigorously on Lambert's behalf: he requested a sidebar conference, and forcefully argued that Judge Geisz should instruct the jury that the "(e)(1)" mitigating circumstance ("no significant history of prior criminal convictions") applied to Petitioner.  (N.T. Apr. 25, 1984 at 60-65).  Under these circumstances, we simply cannot conclude that Lambert waived his right to counsel.  Petitioner is not entitled to relief on this basis. _____

### G.   Claim 20

Petitioner also asserts that trial counsel was constitutionally ineffective under Strickland, and constructively abandoned his role as an advocate, when he failed to present any evidence or argument to the jury during the penalty phase.  Petitioner raised the Strickland ineffectiveness

103

claim in his first PCRA petition, and Judge Poserina rejected it on the merits because Lambert specifically "directed trial counsel not to prove or argue mitigating factors." (Poserina, slip op. at 9). Petitioner raised the "constructive abandonment" argument for the first time on PCRA appeal to the Pennsylvania Supreme Court, but the OAJ held it was waived because Petitioner failed to include it in his PCRA petition. Lambert-2, 797 A.2d at 241 n.6. We review Judge Poserina's decision under AEDPA's deferential standard of review, and consider the constructive abandonment claim de novo.

### 1.   Ineffective Assistance of Counsel Under *Strickland*

Petitioner contends that Irwin failed to conduct an adequate investigation of his background in preparation for the sentencing hearing, and therefore could not properly advise Lambert of the value of mitigating evidence and the consequences of foregoing its presentation. Moreover, according to Petitioner, his "purported waiver of mitigation did not absolve [trial] counsel of his duty to conduct a thorough social history investigation." (Petr's Br. 180). This argument is meritless in light of Landrigan. In Landrigan, the Ninth Circuit held, based on Wiggins v. Smith, 539 U.S. 510 (2003), that a defendant's "last-minute decision" not to present mitigating evidence could not "excuse his counsel's failure to conduct an adequate investigation prior to the sentencing." Landrigan v. Schriro, 441 F.3d 638, 647 (9th Cir. 2006) (emphasis in original). The Supreme Court reversed the Ninth Circuit, holding that it was not objectively unreasonable under § 2254(d) for the Arizona post-conviction court "to conclude that a defendant who refused to allow the presentation of any mitigating evidence could not establish Strickland prejudice based on his counsel's failure to investigate further possible mitigating evidence." 127 S.Ct. at 1942. Thus, we cannot fault Irwin for his penalty phase preparation,

104

when Lambert specifically instructed him not to present any mitigating evidence during sentencing.

### 2.   **Constructive Abandonment Under *Cronic***

Petitioner also claims that defense counsel constructively abandoned him during sentencing by "entirely fail[ing] to subject the prosecution's case to meaningful adversarial testing" within the meaning of United States v. Cronic, 466 U.S. 648, 659 (1984).  Specifically, Petitioner contends that Irwin adopted a "plotted plant" approach to the penalty phase by failing to investigate or present mitigating evidence, request a competency hearing, or object to a series of unconstitutional jury instructions.

We disagree.  As previously noted, Lambert placed specific restrictions on Irwin's penalty phase representation, and we will not fault Irwin for abiding by those limitations.  Furthermore, the Supreme Court has clarified that Cronic applies only when "counsel entirely fails to subject the prosecution's case to meaningful adversarial testing."  Bell v. Cone, 535 U.S. 685, 697 (2002) (emphasis in original).  A claim that counsel "failed to oppose the prosecution . . . at specific points [e.g., by failing to adduce mitigating evidence or waiving closing argument]" is more appropriately analyzed under Strickland.  Id. at 697-98.  Here, Petitioner claims only that Irwin abandoned him at specific points of the penalty phase (i.e., by failing to adequately investigate his background or request a competency hearing).  Accordingly, the principles set forth in Strickland, not Cronic, govern.

### H.   **Claim 21**

Petitioner contends his death sentence was the product of racial discrimination, relying on the Baldus study and McMahon tape for support.  Petitioner raised this claim in a

Motion for Remand to the PCRA Court on the Basis of Newly Discovered Evidence, which the

Pennsylvania Supreme Court rejected in a December 20, 2001 Order.  Lambert-2, 797 A.2d at

237 n.4 (referencing court's previous denial of Lambert's Motion for Remand).  We apply

AEDPA's deferential standard of review, and conclude that the state court decision was not

contrary to or an unreasonable application of clearly established Supreme Court precedent.

In McCleskey v. Kemp, 481 U.S. 279 (1987), the Supreme Court rejected a similar

argument, observing that petitioner relied "solely on the Baldus study" and "offer[ed] no

evidence specific to his own case that would support an inference that racial considerations

played a part in his sentence."  Id. at 292-93.  Lambert, like McCleskey, has failed to produce

any evidence establishing discrimination specific to his case.  See supra pp. 43-60 (rejecting

Petitioner's claim that the prosecutor exercised his peremptory challenges in a racially

discriminatory manner).  With regard to the McMahon tape, we agree with the Pennsylvania

Supreme Court that "the mere existence of the tape does not demonstrate prejudice in a

particular case" where McMahon was not the prosecutor.  Commonwealth v. Williams, 863

A.2d 505, 523 (Pa. 2004).  Accord Abu Jamal v. Horn, No.Civ.A. 99-5089, 2001 WL 1609690,

at *109 (E.D. Pa. Dec. 18, 2001) ("[The McMahon] tape is irrelevant because its production

occurred five years after petitioner's trial and because it relates to the views of McMahon, not

those of [the prosecutor in this case].").  Prior counsel was not ineffective for failing to raise this

clam on direct appeal.

**I.  Claim 22**

Petitioner asserts that the Pennsylvania Supreme Court failed to provide him with

meaningful proportionality review, as mandated by 42 Pa. Const. Stat. § 9711(h)(3)(iii),[59] in

violation of his due process rights.  Petitioner never raised this claim in state court, but contends

his failure to exhaust is excused under § 2254(b)(1) because a "return to state court would be

futile. . . ."  Lines v. Larkins, 208 F.3d 153, 162 (3d Cir. 2000).  Futility exists where:

> a state's highest court has ruled unfavorably on a claim involving facts and issues
> materially identical to those undergirding a federal habeas petition and there is no
> plausible reason to believe that a replay will persuade the court to reverse its
> field.

Id. (quoting Allen v. Attorney General of Maine, 80 F.3d 569, 573 (1st Cir. 1996)).  Here,

Petitioner claims the Pennsylvania Supreme Court has repeatedly rejected similar challenges to

proportionality review, and has expressed an unwillingness to revisit its prior decisions.  (Petr's

Br. 192).

Assuming, without deciding, that exhaustion is excused under § 2254(b), we conclude

there was no due process violation.  Petitioner claims he was denied meaningful proportionality

review because he was not given an opportunity to review and challenge the information relied

on by the Pennsylvania Supreme Court, and because the database, data collection instruments

and methodology employed in the review process were "egregiously" flawed.  (Petr's Br. 187-

191).

In Riley v. Taylor, 277 F.3d 261 (3d Cir. 2001) (en banc), the Third Circuit observed, "it

is unclear whether, under Third Circuit law, a state proportionality-review statute creates any

cognizable liberty interest for due process purposes."  Id. at 311.  Assuming defendants have

---

[59] Although proportionality review was statutorily mandated at the time of Petitioner's
trial, the state legislature eliminated it from Pennsylvania's death penalty statute on June 25,
1997.

such a liberty interest, "a federal court may only inquire into whether the state court 'undertook its proportionality review in good faith and found that [the defendant's] sentence was proportional to the sentences imposed in cases similar to his.'"  Id. (quoting Walton v. Arizona, 497 U.S. 639, 656 (1990)).  "[I]f the federal court finds that the review was undertaken in good faith, it cannot 'look behind' the state court's conclusion of proportionality to consider whether the state court misapplied state proportionality law."  Id. at 311-312.

In this case, the Pennsylvania Supreme Court concluded on direct appeal that Petitioner's death sentence was not excessive or disproportionate to penalties imposed in similar cases, based on a review of the "data and information pertaining to similar cases that have been compiled by the Administrative Office of Pennsylvania Courts (AOPC). . . ."  Lambert-1, 603 A.2d at 580.   Petitioner has presented no evidence that the Pennsylvania Supreme Court conducted its proportionality review in bad faith.  Therefore, under Riley, we cannot "look behind" the court's conclusion of proportionality to consider whether or not the Pennsylvania Supreme Court properly applied the proportionality statute.  This is beyond the scope of federal habeas review.  Accord  Kindler v. Horn, 291 F.Supp.2d 323, 353 (E.D. Pa. 2003) ("[Because] Petitioner has not presented any evidence to suggest that the Pennsylvania Supreme Court did not conduct its review in good faith, we cannot grant Petitioner habeas relief on this basis."); Laird v. Horn, 159 F.Supp.2d 58, 125 (E.D. Pa. 2001) (same).  Prior counsel was not ineffective for failing to raise this claim.

### J.   Claims 23 and 24

_____Finally, Petitioner contends he is entitled to habeas relief because of the cumulative effect of prior counsels' deficient performance (Claim 23), and the cumulative prejudice

resulting from all alleged constitutional errors (Claim 24).  Petitioner raised a claim of

cumulative prejudice on PCRA appeal, and the OAJ held it was waived because he did not

include it in his PCRA petition.  Lambert-2, 797 A.2d at 240-41 n.6.  The procedural bar

identified by the OAJ is inadequate to bar federal habeas review, and we consider the claim of

cumulative error de novo.

"[E]rrors that individually do not warrant habeas relief may do so when combined."

Albrecht v. Horn, 485 F.3d 103, 139 (3d Cir. 2007) (citing Marshall v. Hendricks, 307 F.3d 36,

94 (3d Cir. 2002)).  When performing a cumulative error analysis, a reviewing court "aggregates

all the errors that individually have been found to be harmless, and therefore not reversible, and

. . . analyzes whether their cumulative effect on the outcome of the trial is such that collectively

they can no longer be determined to be harmless."  Id. (quoting Darks v. Mullin, 327 F.3d 1001,

1018 (10th Cir. 2003)).  In this case, there is nothing to "aggregate," as we have not identified

any constitutional errors in either the guilt or penalty phase of Lambert's trial.  Accordingly,

Petitioner is not entitled to relief on this basis.

**XI.** **Conclusion**

For the reasons stated above, the petition for a writ of habeas corpus will be denied, and

a certificate of appealability will be issued with respect to Claim Eleven (Batson) and Claim

Sixteen (Mills).  An appropriate Order follows.

A:\Lambert v. Beard 02-9034.wpd

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| JAMES LAMBERT, | : | CIVIL ACTION |
| Petitioner | : | |
| | : | |
| v. | : | |
| | : | |
| JEFFREY BEARD, et al, | : | NO 02-9034 |
| Respondents | : | |

## ORDER

AND NOW, this 24th day of July, 2007, it is hereby ORDERED that the Petition for Writ of Habeas Corpus, filed pursuant to 28 U.S.C. § 2254, is DENIED.

A certificate of appealability is GRANTED, pursuant to 28 U.S.C. § 2253(c)(2), with respect to the following issues:

1. Claim Eleven: whether the Commonwealth exercised its peremptory strikes in a racially discriminatory manner in violation of <u>Batson v. Kentucky</u>, 476 U.S. 79 (1986).

2. Claim Sixteen: whether the penalty phase jury instructions and verdict sheet indicated that the jury unanimously had to find a mitigating circumstance before they could give effect to it, in violation of <u>Mills v. Maryland</u>, 486 U.S. 367 (1988).

The Clerk shall close this case.


BY THE COURT:

**/s/ Michael M. Baylson**

Michael M. Baylson, U.S.D.J.